**ASSOCIATION OF ADMINISTRATIVE LAW JUDGES, INC., Plaintiff,**

v.

**Margaret M. HECKLER, et al., Defendants.**

**Civ. A. No. 83–0124.**

United States District Court, District of Columbia.

Sept. 10, 1984.

Elliott L. Richardson, Peter E. Halle, Milbank, Tweed, Hadley & McCloy, Washington, D.C., for plaintiff.

Richard A. Levie, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff, the Association of Administrative Law Judges, is a not-for-profit corporation whose members are administrative law judges (ALJs) employed by the Department of Health and Human Services (HHS) and assigned to the Office of Hearings and Appeals (OHA) of the Social Security Administration (SSA). Plaintiff's members adjudicate claims for disability benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (1982) and 42 U.S.C. §§ 1381 *et seq.* (1982). Plaintiff brought this lawsuit to challenge the "Bellmon Review Program", which defendants instituted to implement Section 304(q) of the Social Security Disability Amendments of 1980, the "Bellmon Amendment".[1] Plaintiff alleges that this program violates the rights of its members to decisional independence under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.* (1982).

State agencies administer the Social Security Disability Insurance Program pursuant to agreements with the SSA. Based upon medical information received from various sources and applying SSA guidelines, the state disability determination service issues the decision of SSA. A claimant who is denied benefits may file for reconsideration at the state level and if dissatisfied may then seek relief on the federal level. The ALJ hearing is a *de novo* proceeding. The ALJ is the first agency personnel in the review process to interview the claimant in person. The claimant may submit additional evidence, produce expert witnesses, and be represented by counsel. If his or her claim is denied by the ALJ, the claimant may appeal to the Appeals Council, which is the last step in the administrative process.

The Appeals Council has the authority to review all decisions of ALJs, at its own discretion ("own motion"), or at the request of a claimant. In either case, the Appeals Council is authorized to exercise jurisdiction only when: (1) there appears to be an abuse of discretion by the ALJ; (2) there is an error of law; (3) the action, findings or conclusions of the ALJ are not supported by substantial evidence; or (4) there is a broad policy or procedural issue that may affect the general public interest. 20 C.F.R. § 404.970(a), 416.1470(a) (1984). Based upon its review, the Appeals Council may modify, affirm, reverse or remand the ALJ's decision. When the Appeals Council reverses or remands an ALJ's decision, it issues an opinion stating the grounds for reversal or remand and identifying dispositive abuses of discretion, errors of law, problems with conclusions of law and findings of fact, insufficiencies of evidence, and policy or procedural issues of concern to SSA. If a case is remanded, the ALJ must take any action ordered by the Appeals

---

1. Pub.L. No. 96–265 (1980) (discussed at 42 U.S.C. § 421 (1982)).

 Council, but may also take any additional action that is not inconsistent with the remand order.

The Bellmon Amendment directed the Secretary of HHS to resume review of decisions of ALJs on her own motion. Congress expressed concern at that time about the high rate at which ALJs were reversing determinations made at the state level and the variance in these rates among ALJs. *See* H.R.Rep. No. 944, 96th Cong., 2d Sess. 57 (1980), *reprinted in* [1980] *U.S.Code Cong. & Ad.News* 1392, 1405; S.Rep. No. 408, 96th Cong., 2d Sess. 53 (1980), *reprinted in* [1980] *U.S.Code Cong. & Ad.News* 1277, 1331.

A study performed pursuant to the Bellmon Amendment and described in a report to Congress in January 1982 (PX–1), indicated that the Appeals Council more often would have changed decisions by ALJs allowing benefits made by ALJs with above average allowance rates than allowance decisions made by ALJs with average or below-average allowance rates.[2] The Bellmon Review Program, a series of measures designed to improve decisional quality and accuracy, began in October, 1981. Associate Commissioner of SSA, Louis B. Hays, announced that four categories of cases would be selected for possible "own motion" review:

| | |
|---|---|
| (1) National random sample | 21% |
| (2) Allowance decisions of new ALJs | |
| (3) Decisions referred by SSA's Office of Disability Operations | 16% |
| Individual ALJs | 63% |

Initially, individual ALJs with allowance rates of 70% or higher were to have 100% of their allowance decisions reviewed for accuracy and hearing offices with allowance rates of 74% or higher would also be reviewed. 106 ALJs, or approximately 13% of all ALJs in SSA, were placed on Bellmon Review because of their high allowance rates. The selection of entire hearing offices for review was soon discontinued. The other three categories of review were not yet operative.

An overview of the program was communicated to the ALJ corps in a Memorandum dated September 24, 1982 from Mr. Hays. (PX–111) ("Hays Memorandum"). That Memorandum explained that Bellmon Review was being instituted because of Congressional concern about high allowance rates and because only ALJ decisions denying benefits were generally subject to further review. Allowance rates were used as the basis for selecting the initial review group, in part, because studies had shown that decisions in this group would be the most likely to contain errors which would otherwise go uncorrected.

Based upon own-motion rates (the frequency with which the Appeals Council takes action to correct an ALJs decision, as calculated by the Office of Appraisal) the individual ALJs were divided into four groups: 100% review; 75% review; 50% review and 25% review. In determining whether an ALJ should be removed from review, the Appeals Council considered only decisional accuracy, defined as a 5% own motion rate for three consecutive months. An ALJ with a 5% own motion rate could be said to be 95% accurate. Shortly after implementation, the criteria for removing targeted ALJs from review were amended.[3] The 5% own motion rate

---

**2.** Plaintiff faulted this study because its results were reached during the time the "short form fully favorable" was in use. That form was phased out after Bellmon Review began. Many of the ALJs who were placed on Bellmon Review as a result of this study did not have experience with the sequential evaluation process of writing decisions.

**3.** The removal criteria were originally set forth in a Memorandum from Levi J. Ogden, Director of OHA's Office of Appraisal, to Mr. Hays. (PX–29). Three options were presented. Option 1

provided that ALJs in the 25% review category would be removed from review when the 95% level of accuracy had been approached and maintained for one month. (This option was ultimately approved with a modification by Mr. Hays, who changed one month to three months). Mr. Ogden recognized at the time that the 95% level could be difficult to achieve but that its employment could result in lowered allowance rates. (PX–29). In fact, Mr. Ogden testified, no ALJs were ever removed from review on the basis of having achieved a 5% own motion rate. Mr. Hays testified that at the time

was abandoned in favor of an own motion rate approximating that of the national random sample.[4]

A companion system for providing individualized feedback and counseling on the results of the review was also described in the Hays Memorandum. Never implemented, this feedback system was intended to complement the case-by-case feedback which occurs through the process of reversals and remands by advising ALJs of "decisional weaknesses and provid[ing] a mechanism for achieving long term improvement." Plaintiff's members believed that the feedback memoranda developed for peer counseling sessions that were scheduled to be held in January 1983 would direct high allowance ALJs how to develop, hear and decide cases. No counseling sessions under this program were ever conducted. Defendants decided not to initiate the feedback proposal except with respect to ALJs who choose to participate.[5]

Finally, the Hays Memorandum advised that if, after further review an ALJ's performance had not improved, "other steps" would be considered. Understandably, plaintiff's members viewed that as a warning that OHA would recommend that charges be brought before the Merit Systems Protection Board (MSPB) seeking adverse personnel action, which could include dismissal. *See* testimony of Francis Mayhue, Robert B. Murdock.

The Bellmon Review Program has evolved substantially since the Hays Memorandum was issued. Significantly, in April 1982, before this lawsuit was filed, defendants stopped using allowance rates to target ALJs for Bellmon Review once own motion data became available.[6] The ALJs whose allowance decisions were reviewed were selected for individual review solely on the basis of their own motion rates under the national random sample.

In mid-1983, OHA began to include in Bellmon Review unappealed decisions denying benefits by ALJs with high "grant-review" rates—the rates at which the Appeals Council grants claimants requests for review of denial decisions.[7] This part of the program was not communicated to the ALJ corps at large,[8] nor were written rules or procedures for this part of the program developed.

Most recently, OHA, under a new Associate Commissioner, has eliminated entirely the individual ALJ portion of Bellmon Review. Notice of Filing June 22, 1984, Memorandum to all ALJs, June 21, 1984. This Memorandum indicates that the number of

---

he approved Option 1, as modified, he questioned whether the 5% own motion rate was a realistic standard. He had been advised by the Office of Policy and Procedures that the 5% own motion rate was "unrealistic, essentially arbitrary ... and possibly inequitable." (PX–29A).

4. However, this change was not communicated to the ALJ corps at large. The national random sample did not include a certain portion of decisions of ALJs under Bellmon Review.

5. The proposed feedback system under Bellmon Review resembles the defunct Appellate Appraisal System. *See* PX–266. However, unlike that System, under Bellmon Review, the Appeals Council would not have been involved with the feedback process apart from issuing opinions reversing or remanding ALJ decisions.

6. The Appeals Council had not routinely exercised its own authority for several years prior to the Bellmon Amendment.

7. Grant-review was instituted despite a study of unappealed denial decisions by low allowance ALJs conducted by the Office of Appraisal, which indicated no need for such review except in extreme cases. (PX–352). *See* testimony of Levi J. Ogden. *But see* PX–163.

8. At trial, Mr. Hays explained that since this was a matter likely to be raised in litigation, he felt that it was advisable to withhold this information. In addition, the relatively small size of the grant-review portion of the Bellmon Review rendered it a less appropriate subject for a general Memorandum. Those ALJs who were placed on grant-review were informed about its operation.

Had Mr. Hays informed the ALJ corps about this portion of the review, the negative reaction to the initial focus on allowance decisions only may have been tempered somewhat. However, although plaintiff stressed the unfairness of the initial focus on allowance decisions only, counsel argued that even a grant-review program or a low allowance review program initially adopted under Bellmon Review would have violated decisional independence.

cases reviewed under the national random sample will be increased. Apparently, the results of Bellmon Review demonstrated that the difference between the own motion rates of the selected ALJ and national random sample portions of the review had progressively narrowed, which suggested that overall, decisional quality and consistency had improved. The review of unappealed denial decisions by high grant-review ALJs has also been discontinued to be replaced by review of a national random sample of such decisions. These changes have been instituted on an interim basis only.

Plaintiff charged that the targeting of individual ALJs under Bellmon Review, based upon allowance rates and then own motion rates, was in essence an attempt to influence ALJs to reduce their allowance rates and thereby compromise their decisional independence.

The president of plaintiff Association, Charles Bono, sent a Mailgram to Associate Commissioner Hays (PX–110) in response to the Hays Memorandum requesting that the Bellmon Review Program be abandoned. Mr. Bono stated that the Bellmon Review Program would result in illegal performance ratings of ALJs and would have the effect of chilling ALJ decisional independence.[9] Mr. Hays did not respond to this Mailgram.

Mr. Hays sought advice from the Office of the General Counsel for SSA, concerning the legality of targeting high allowance ALJs for Bellmon Review. (PX–387). The Office of General Counsel recognized that the Senate version of the Bellmon Amendment required such targeting but that the Conference Report did not. The Office of General Counsel inferred from the legislative history that targeting may have been perceived as having a possible chilling effect on the decisional independence of targeted ALJs. It concluded that while the law did not directly preclude targeting, there could be some legal risk, and sug-

gested the desirability of reviewing some denial decisions. Although Mr. Hays had solicited the advice of the General Counsel, he did not accept it, viewing the matter differently. He testified at trial that he interpreted the Bellmon Amendment and its legislative history *to require* the focus on allowance decisions only. His decision to focus initially on allowance decisions only was based upon several additional factors: the findings of the Bellmon study later reported to Congress; that own motion data was not yet completely available; that a high proportion of denial decisions were already being reviewed on requests of claimants; that the grant-review rate for denial decisions was fairly low; that data from review of the Fort Smith (Arkansas) Hearing Office demonstrated that denial decisions were generally correct; and the efficient allocation of limited resources.

Plaintiff presented evidence that there were significant problems with unappealed denial decisions which Mr. Hays did not take into account in his initial implementation of Bellmon Review. (PX–163). Moreover, the Bellmon "work group" had concluded in August 1980, that at least some denial decisions should be included in the Bellmon Review process to avoid biased adjudication and any denial of due process. (PX–407).

It was plaintiff's view that Mr. Hays had a financial incentive to pressure ALJs to reduce their allowance rates. As a member of the Senior Executive Service, he had a performance plan which stated as one of its goals or objectives, the reduction of allowance rates. (PX–368C, 368B). Mr. Hays' performance was rated higher in FY 1981, a year in which such a reduction took place, than in FY 1982, when it did not. Mr. Hays stressed that his performance plan goal, to improve the quality of adjudication in OHA, was derived in response to Congressional criticism. Studies had shown a correlation between high allowance rates and high error rates. Thus, Mr.

---

**9.** Some of plaintiff's members felt that maintaining statistics based upon allowance rates constituted illegal performance ratings. *See*

Testimony of Robert M. Murdock; PX–378 (based upon own-motion rates released pursuant to the Freedom of Information Act).

Hays expected that improved quality of adjudication would lead to some reduction in allowance rates, particularly since allowance decisions had not been subject to review by the Appeals Council for several years. Mr. Hays denied that the reduction of allowance rates was an independent goal in the performance plan. *See also* PX–301, 309.

Plaintiff also charged that OHA had at least considered allowance rate goals for the ALJ corps. One option for removal of targeted ALJs from review which was not implemented, was to remove ALJs from review when their allowance rates equaled or surpassed OHA's fiscal year goals. (PX–29). Mr. Hays disapproved this option and noted specifically, at that time, that no goal existed to reduce allowance rates, only one to improve decisional quality and consistency, which could have, as one effect, a reduction in allowance rates. Mr. Ogden testified that when he used the term "goal", he meant rather a budgetary assumption. Both Mr. Ogden and Mr. Hays explained that SSA must project allowance rates for budgetary purposes. Both denied that OHA made any attempt to keep allowance rates within the projections for any given year. OHA provided information to SSA, but did not determine the final estimates. *See* PX–288. Nonetheless, OHA continued to use the term "goals" to describe SSA projections of allowance rates. The insensitive choice of that term could reasonably have indicated that SSA considered a certain number of allowances too many.

Evidence apart from the budgetary projections cumulatively, and strongly, suggested that OHA had an ulterior goal to reduce ALJ allowance rates. When Mr. Hays first became Associate Commissioner, he issued a memorandum to the ALJs, in which he noted a perception that ALJ allowance rates were "untenable". (PX–157). Sometime later, he sent a memorandum to SSA, in which he described as "good news" a decline in allowance rates. (PX–360). Mr. Hays received a memorandum from SSA's Office of Management Coordination, which requested a decrease

in the variance among allowance rates and a decrease in allowance rates overall. (PX–324). *See also* PX–187, PX–189, PX–193, PX–197, PX–198, PX–199, PX–200, PX–201 (Reports on Bellmon Review tracking allowance rates of ALJs on Bellmon Review without mention of quality and consistency).

Much of the testimony in this case involved the Fort Smith, Arkansas Hearing Office. On December 10, 1980, prior to the institution of the Bellmon Review Program, Deputy Chief ALJ J. Robert Brown visited the Fort Smith Hearing Office to discuss with ALJs Jerry Thomasson, Francis Mayhue and David Hubbard the possible reasons why the allowance rate of the Fort Smith Hearing Office was significantly higher than the allowance rate of the Little Rock, Arkansas Hearing Office, which received cases from the same state agency. The allowance rate at Fort Smith was approximately 90%. *See* testimony of Andrew J. Young. ALJs Thomasson and Mayhue suggested that the Appeals Council review 100% of their decisions. These ALJs voluntarily submitted some of their decisions to Judge Brown, who reviewed and discussed them with other OHA personnel. In many cases, these decisions did not clearly convey what factors were considered in reaching the decision. Judge Brown provided the Fort Smith ALJs with an instructional memorandum that included samples of decisions from Fort Smith, both as they were written and as OHA had revised them. The results of the decisions were not changed.

The Fort Smith ALJs were subsequently advised by Chief ALJ Phillip Brown, that effective August 17, 1981, the Appeals Council would begin reviewing all of their decisions. The Fort Smith Review was a separate program entirely from Bellmon Review. During the course of its review OHA discovered significant deficiencies in the quality and accuracy of the Fort Smith Hearing Office decisions. *See, e.g.,* DX–J6. *See* testimony of Burton Berkley regarding decisions of Judge Thomasson; DX–Y2; DX–P6. OHA decided to provide training

to ALJs Thomasson and Mayhue on the application of the Social Security disability regulations and the sequential evaluation process of adjudicating cases. Judge Hubbard was not included in the training because he appeared generally to understand the regulatory scheme.

The training took place in January 1982 at OHA Headquarters in Arlington, Virginia. The individuals conducting the training, William LaVere, Deputy Director of the Office of Appeals Operations, and Burton Berkley, Deputy Chairman of the Appeals Council, testified that the sole purpose of the training was to help the Fort Smith ALJs issue correct decisions and not to pressure them to reduce allowance rates. Indeed, Mr. Berkley testified that he did not even know the allowance rates of the Fort Smith ALJs.

Judge Thomasson believed that the training was prompted by the high allowance rates and labor-management problems in the Fort Smith office, and designed to pressure him to allow fewer claims for benefits. He testified, as did Judge Mayhue, that Mr. LaVere had told them both that the only way to be free of OHA scrutiny was to lower their allowance rates to the national average of 45–55%. However, Mr. LaVere testified that he merely informed them of the national average in response to Judge Mayhue's inquiry. Mr. LaVere also testified that Judge Thomasson stated in the training session that he did not read the regulations of the Secretary. Mr. LaVere recommended that Judge Thomasson be place on 100% Bellmon Review based upon his own motion rate. (DX–H3). Mr. Berkley testified that Judge Thomasson's writing did not improve at all while he was on Fort Smith Review.

In December 1981, Don Przybylinski, Special Counsel of OHA, visited the Fort Smith Hearing Office to conduct a preliminary investigation of complaints concerning labor-management problems, alleged time-and-attendance violations, and unfair labor practice charges that had been filed against OHA by employees of the Fort Smith office. This visit was independent of OHA's concern about the Fort Smith ALJs' allowance rates. Mr. Przybylinski testified that Judge Thomasson introduced the subject of allowance rates during that visit but that he did not discuss that subject. He denied telling Judge Thomasson that the allowance rates in the Fort Smith office must be lowered, as Judge Thomasson had testified, and as Betty Davis stated in her deposition. From all of this evidence it appears that OHA was genuinely concerned about the quality of Judge Thomasson's decisions and not his allowance rate.

Judge Mayhue had been relying on Court cases which did not conform to the Secretary's regulations and cases which pre-dated certain of the Secretary's regulations. Yet, it was never suggested to Judge Mayhue that he could be disciplined for those decisions. In fact, Mr. Berkley testified that the quality of Judge Mayhue's decisions increased markedly. Nonetheless, Judge Mayhue was put on Bellmon Review when Fort Smith Review ended. (PX–328). Judge Hubbard was also placed on Bellmon Review. As part of this training Judges Thomasson and Mayhue were sent to Southfield, Michigan to hold hearings on remand in cases which they had decided. An administrative decision was made that the education of these ALJs outweighed any expense and delay involved. No punishment of any sort was intended.

At trial, plaintiff identified other practices of defendants, which allegedly interfere with ALJ decisional independence. First, plaintiff objected to the Secretary's policy of nonacquiescence in certain federal court decisions. See Testimony of Jerry Thomasson, Francis Mayhue, David Hubbard. The position description for ALJs (PX–103) requires ALJs to take those decisions into account in the decisionmaking process. Thus, plaintiff asserted that some ALJ allowance decisions are considered erroneous by the Appeals Council when, in fact, they would be upheld on appeal to a United States District Court. Own motion rates, therefore, are inflated because they do not reflect the ultimate judicial disposition of the ALJs own motion cases.

The Secretary's policy of nonacquiescence, as explained by Mr. Berkley, has been in existence since SSA was established. The Secretary follows only the decisions of the Supreme Court of the United States, or those decisions which she decides to adopt by changing the regulations and those decisions in which the Commission decides to acquiesce. This system is intended to insure that claimants in all parts of the country are governed by the same laws, rules and regulations.

Second, plaintiff asserted that OHA personnel which represent SSA in disability hearings before ALJs under the experimental Government Representative Program, act as prosecutors in cases where the claimant is represented by counsel. Mr. Hays testified that the government representative develops a case for both sides based upon the prehearing record to determine whether or not the representation should be undertaken. The development work would be made available to the ALJ, at which time the government representative might recommend that the ALJ issue a fully favorable decision on the record. Alternatively, the government representative presents the government's case at the hearing. If the ALJ decides in favor of the claimant, the government representative may refer the case to the Appeals Council for possible review on its own motion.

As the program is now structured, the government representatives are ultimately responsible to the head of OHA, the same individual who supervises ALJs and has the authority to recommend disciplinary action. To remedy this problem, plaintiff requested that the Government Representative Program be administered outside of OHA. Mr. Hays testified that the program could function elsewhere in SSA.

Third, plaintiff objected to the Appeals Council's *ex parte* use of the opinions of medical support staff. However, Mr. Berkley satisfactorily explained that when the Appeals Council relies on an opinion of a member of its medical support staff as the underlying basis for reversal of an ALJ decision, whether favorable or unfavorable, the medical support staff opinion is entered into the administrative record after the claimant has been given the opportunity to review and comment on it. Were this otherwise, an incomplete administrative record would be presented to the federal court ultimately reviewing the agency decision. Opinions of medical support staff are used primarily where new evidence is presented to the Appeals Council and where the ALJ clearly did not appear to understand the medical evidence, in which case the medical support staff would prepare a summary of the evidence in the record.[10]

With reason, plaintiff and its members viewed defendants' combined actions as a message to ALJs to tip the balance against claimants in close cases to avoid reversal or remand by the Appeals Council, which would increase their own motion rate, which would result in being placed on Bellmon Review, with the added potential for peer counseling and MSPB proceedings. Judge Ainsworth H. Brown testified that he felt compelled to practice defensive adjudication in order to protect himself and the record. In sum, Bellmon Review, according to plaintiff, had the purpose and

---

**10.** Plaintiff challenged numerous other practices of defendants, as well as those described above. Among them, plaintiff charged, without sufficient evidentiary substantiation, that the Office of Appeals Operations, a component of OHA, acts as a prosecutorial body, actively seeking out ALJ allowance decisions to be reversed by the Appeals Council.

Plaintiff also questioned whether the Appeals Council applies the same standard of review in own motion cases as it does when it reviews cases pursuant to claimant requests. Mr. Berkley testified that, although at one time the possibility of different standards was considered, the standard employed is the same in all cases: The Appeals Council reviews the ALJ's decision to determine whether it was supported by substantial evidence. (PX–382, PX–420). If substantial evidence is lacking to support a particular finding, the decision will nonetheless be upheld, without an opinion, if the result is supported by substantial evidence. If the Appeals Council reviews a decision of an ALJ on its own motion and reverses or remands the decision because it was not based upon substantial evidence, presumably the ALJ's own motion rate would be affected.

effect of chilling ALJ decisional independence so as to lower the ALJ allowance rate. *See* testimony of Charles Bono, Jerry Thomasson, Francis Mayhue.

Defendants' position throughout this litigation, expressed by Mr. Hays emphatically at trial, has been that there is no agency policy to reduce allowance rates. The agency's policy is to reduce inconsistency in the application of law and regulations both within the ALJ corps and in the different levels of the adjudicatory process, and to reduce the number of decisions that do not correctly apply substantive agency policy. In keeping with this policy, OHA recognized that high allowance rates may indicate undue inconsistency of adjudicatory standards within SSA and that a reduction of that inconsistency may result in or be reflected by some reduction in allowance rates, among other things.[11] Defendants maintained that ALJs were not ranked by allowance rates.

Defendants insist that no adverse action is planned against any ALJ based on the ALJ's failure to maintain an acceptable level of decisional correctness, but have not ruled out the possibility that such action may be necessary in the future in an extreme case. Indeed, participants at a meeting about feedback under Bellmon Review considered that in phase three of the feedback program, "assuming no changed behavior on the part of the individual ALJ, OA [Office of Appraisal] would initiate a memorandum to the ALJ recommending that the ALJ file be turned over to the Office Special Counsel for Administrative processing through OPM [Office of Personnel Management] for appropriate action." (PX–17). *See* testimony of Levi J. Ogden.

Yet, Mr. Hays denied any intention to pursue disciplinary action when he referred to "other steps" in the Hays Memorandum. He never even imagined that the Bellmon Review Program could have a chilling effect on ALJs, particularly since their denial

decisions had always been subject to review. He believed that ALJs would successfully resist any possible pressure.

The APA contains a number of provisions designed to safeguard the decisional independence of ALJs. *See generally, Butz v. Economou,* 438 U.S. 478, 513–14, 98 S.Ct. 2894, 2914–15, 57 L.Ed.2d 895 (1978); *Ramspeck v. Federal Trial Examiners Conference,* 345 U.S. 128, 132, 73 S.Ct. 570, 573, 97 L.Ed. 872 (1953); *Nash v. Califano,* 613 F.2d 10, 15–16 (2d Cir.1980). Although employees of the selecting agency, ALJs are entitled to pay prescribed by the Office of Personnel Management independently of agency recommendations or ratings. 5 U.S.C. § 5372 (1982), 5 U.S.C. § 554 (1982). They are exempted from the performance appraisals to which other Civil Service employees are subject. 5 U.S.C. § 4301(2)(D) (1982). *See also* 5 C.F.R. § 930.211 (1984). ALJs do not receive monetary awards or periodic step increases based upon performance. Cases must be assigned whenever possible, in rotation, an ALJ may not be assigned duties inconsistent with his or her responsibilities as an ALJ, and an ALJ may not communicate *ex parte* with anyone inside or outside the agency about the facts of a particular case. 5 U.S.C. §§ 3105, 557(d)(1) (1982).

In order to institute an adverse action against an ALJ, the employing agency must establish good cause after an opportunity for a hearing before the MSPB. 5 U.S.C. § 7521(a) (1982). This section permits the institution of performance-related adverse actions despite the proscription of 5 U.S.C. § 4301. *See Drew v. U.S. Dep't of the Navy,* 672 F.2d 197, 201 (D.C.Cir.) *cert. denied,* 459 U.S. 1072, 103 S.Ct. 493, 74 L.Ed.2d 634 (1982). By implication, then, an agency may gather data and form an opinion of an ALJ's performance. *See* J. Mashaw, et al., Social Security Hearings and Appeals 123 (1978). Accordingly, the mere calculation and maintenance of own

---

**11.** "Targeted Ongoing Review", or Bellmon Review, according to defendants, "is a multifaceted program to correct ALJ [allowances] and, in the process, promote behavioral change. By behavioral change we mean to correct those aspects of decisional performance which do not reflect the content of the law, regulations or SSA policy." (PX–379).

motion and grant-review data does not violate 5 U.S.C. § 4301.

While the position of an ALJ is not "constitutionally protected," *Ramspeck v. Federal Trial Examiners Conference*, 345 U.S. at 133, 73 S.Ct. at 573, in many respects, it is "functionally comparable" to that of a federal judge. *Butz v. Economou*, 438 U.S. at 513, 98 S.Ct. at 2914. The ALJ serves as the factfinder and decisionmaker. ALJs in SSA must provide claimants "full hearings under the Secretary's regulations and in accordance with the beneficient purposes" of the Social Security Act. *Gold v. Secretary of HEW*, 463 F.2d 38, 43 (2d Cir.1972); *see also Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir.1982). To provide a full hearing, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Gold v. Secretary of HEW*, 463 F.2d at 43; *Diabo v. Secretary of HEW*, 627 F.2d 278, 281–82 (D.C.Cir.1980). The ALJ must develop all of the evidence, including that contrary to the claimant's position. *Richardson v. Perales*, 402 U.S. 389, 408–410, 91 S.Ct. 1420, 1430–1431, 28 L.Ed.2d 842 (1971); *Bowman v. Heckler*, 706 F.2d 564, 567–68 (5th Cir. 1983). The conduct of the hearing rests generally in the ALJ's discretion, *Richardson v. Perales*, 402 U.S. at 400, 91 S.Ct. at 1426; the ALJ conducts the hearing according to his own understanding and conscience. *Cf. United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67, 74 S.Ct. 499, 502–03, 98 L.Ed. 681 (1954). Finally, the ALJ must issue a decision based upon the complete hearing record which may include numerous subjective elements. The complete position description for ALJs in SSA (PX–103) is set out in the Appendix made part of this Memorandum Opinion.

On matters of law and policy, however, ALJs are entirely subject to the agency. *E.g., D'Amico v. Schweiker*, 698 F.2d 903, 907 (7th Cir.1983); *See* Scalia, *The ALJ Fiasco—A Reprise*, 47 U.Chi.L.Rev. 57, 62 (1980). Although an ALJ may dispute the validity of agency policy, the agency may impose its policy through the administra-

tive appeals process. In reviewing an ALJ's decision the agency retains "all the powers which it would have in making the initial decision." 5 U.S.C. § 557(b) (1982). If the agency accepts the ALJ's decision, or if that decision is not appealed, it becomes the final decision of the agency. "The statute authorizes the Secretary, not the ALJ, to make reviewable final decisions in disability cases." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.1984). The Secretary has delegated that authority to the Appeals Council. It is the Appeals Council's decision, not the ALJ's, that a court reviews to determine whether the agency's decision is based upon substantial evidence. *Id.* In sum, the ALJ's right to decisional independence is qualified.

The sole issue in this case is whether that qualified right has been violated by the now discontinued individual ALJ portion of the Bellmon Review Program, which targeted individual ALJs initially on the basis of their allowance rates and then on the basis of their own motion rates. Although the evidence at trial did not suggest that defendants intend to resume the practice of targeting high allowance ALJs for Bellmon Review, and although targeted review based upon own motion rates and grant-review rates of individual ALJs is no longer in effect, defendants have advised the ALJ corps of the possibility that Bellmon Review could be resumed. Notice of Filing June 22, 1984, Memorandum to all ALJs June 21, 1984. For this reason, there remains a live controversy between the parties. *See e.g., Murphy v. Hunt*, 455 U.S. 478, 480, 102 S.Ct. 1181, 1182, 71 L.Ed.2d 353 (1982).

At the same time, perhaps in response to this litigation, defendants have modified the Bellmon Review Program significantly for the better. The worthiness of defendants' stated goal of improving the quality and accuracy of decisions notwithstanding, targeting high allowance ALJs for review, counseling and possible disciplinary action was of dubious legality for at least two reasons. First, that practice was not consistent with the language of the Bellmon

Amendment nor its sparse legislative history. Neither directed SSA to focus on allowance decisions or target for review only ALJs with high allowance rates. In his introductory remarks, Senator Bellmon did state that SSA was to review the allowance decisions of those ALJs with high allowance rates but those remarks were not incorporated into the law. *See* Staff of Senate Comm. on Governmental Affairs, 98th Cong., 1st Sess., *The Role of the Administrative Law Judge in the Title II Social Security Disability Insurance Program* 9 (Comm.Print 1983) ("Senate Comm. Print"). Second, high allowance ALJs were initially targeted for review without regard to their actual own motion rates in an overbroad sweep.

The practice of targeting ALJs on the basis of own motion rates, once that data became available, did reflect defendants' stated goal of improving the quality and accuracy of ALJ decisions. However, the evidence as a whole, persuasively demonstrated that defendants retained an unjustifiable preoccupation with allowance rates, to the extent that ALJs could reasonably feel pressure to issue fewer allowance decisions in the name of accuracy. While there was no evidence that an ALJ consciously succumbed to such pressure, in close cases, and, in particular, where the determination of disability may have been based largely on subjective factors, as a matter of common sense, that pressure may have intruded upon the factfinding process and may have influenced some outcomes.[12] In denying this contention, even as a possibility, Mr. Hays may have paid the ALJs an undue compliment. Selecting allowance decisions and unappealed denial decisions· for review for accuracy from the national random sample is undeniably a more equitable and more conciliatory means of accomplishing the same purpose and does not compromise ALJ independence by focusing excessively on allowance rates.

The evidence, on balance, did not suggest that in the controversial proposed feedback system, if it had been implemented, ALJs would have been directed to deny deserving claims for benefits. If a case discussed in a feedback session or memorandum was to be remanded, a different ALJ would be assigned to hear that case.[13] Nor did the evidence suggest that ALJs would be disciplined simply for allowing a large number of deserving claims. Should disciplinary action ever be instituted against an ALJ who failed to maintain an acceptable level of decisions correctness, the MSPB would have to determine whether that constituted "good cause" under the statute. 5 U.S.C. § 7521(a) (1982).

The ALJ is not insulated from review by the Appeals Council for decisional correctness. *See Chocallo v. Bureau of Hearings and Appeals,* 548 F.Supp. 1349, 1361–62 (E.D.Pa.1982), *aff'd without opinion,* 716 F.2d 889 (3d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 426, 78 L.Ed.2d 360 (1983). It appears that ALJs often differ with the Appeals Council as to the definition of correctness in particular cases. This is a matter to be resolved on a case-by-case basis should a claimant appeal the final decision of the agency to a federal district court. *See Baker v. Heckler,* 730 F.2d at 1150. While the ALJ may have difficulty discerning the correct result in a given case because of the Secretary's policy of nonacquiescence in certain federal court decisions,[14] there was no evidence that because

---

12. This conclusion was reached wholly independently of the results of the survey of ALJs by Dr. Donna Price Cofer.

13. The remand policy at OHA has been changed in general. Now, remand cases are put into the· regular rotational process in any given hearing office so that a remand case may or may. not be assigned to the ALJ who made the initial decision. However, the ALJ who made the initial decision still receives a copy of the remand order for feedback purposes.

14. The position description for ALJs in SSA (PX–103) directs ALJs to "take into account all applicable Federal, State and foreign laws, statutes, regulations, rulings, and decisions of the Federal Courts." To the extent the Secretary has not acquiesced in a federal court decision the ALJ is put in the difficult position of "trying to serve two masters; the courts and the Secretary of Health and Human Services." *Hillhouse v. Harris,* 547 F.Supp. 88, 93 (N.D.Ark.1982), *aff'd* 715 F.2d 428 (8th Cir.1983) (*per curiam*).

of that policy any ALJ denied benefits which should have been paid, the questionable legality of that policy notwithstanding.[15]

Nor did the evidence demonstrate that the Government Representative Program has interfered with the decisional independence of any ALJ. While any potential for conflict built into the structure of the program is sharply reduced now that ALJs are no longer subject to Bellmon Review based upon allowance rates or own motion rates, the agency would do well to consider whether any potential of the appearance of conflict might be avoided by some organizational modification.

In sum, the Court concludes, that defendants' unremitting focus on allowance rates in the individual ALJ portion of the Bellmon Review Program created an untenable atmosphere of tension and unfairness which violated the spirit of the APA, if no specific provision thereof. Defendants' insensitivity to that degree of decisional independence the APA affords to administrative law judges and the injudicious use of phrases such as "targeting", "goals" and "behavior modification" could have tended to corrupt the ability of administrative law judges to exercise that independence in the vital cases that they decide. However, defendants appear to have shifted their focus, obviating the need for any injunctive relief or restructuring of the agency at this time. While it is incumbent upon the agency to reexamine the role and function of the Appeals Council and its relationship to the ALJs in light of this litigation, it would be unsuitable for the Court to order any affirmative relief under the present circumstances. Plaintiff has achieved considerable success in its valid attempt to reveal and change agency practices.

It is, therefore, by the Court, this *10th* day of September, 1984

ORDERED that judgment be entered in favor of defendants and that this cause stands dismissed.

15. *See* Senate Comm. Print at 28–29.

### APPENDIX

Position Description, Administrative Law Judge, Social Security Administration

| | | 1. CHECK ONE | 2. OFFICIAL HEADQUARTERS | 4. SSA POSITION NO. |
|---|---|---|---|---|

ona. Form 8(c) (9-71)

**POSITION DESCRIPTION**

1. CHECK ONE: [ ] DEPT. [X] FIELD

2. OFFICIAL HEADQUARTERS: See attached list

4. SSA POSITION NO.: 6679

5. C.S.C. CERTIFICATION NO.

3. Reason for submission:
If this position replaces another (i.e., a change of duties in an existing position), identify such position by title, allocation (service, series, grade), and position number.

6. DATE OF CERTIFICATION

**CLASSIFICATION ACTION**

7. DATE RECEIVED FROM C.S.C.

| ALLOCATION BY | CLASS TITLE OF POSITION | CLASS | | | INITIALS | DATE |
|---|---|---|---|---|---|---|
| | | SERVICE | SERIES | GRADE | | |
| Civil Service Commission | Administrative Law Judge | GS | 935 | 15 | | |
| Department, agency, or establishment | | | | | | |
| Social Security Administration | Administrative Law Judge | GS | 935 | 15 | JG | 3-20-67 |
| Recommended by initiating office | | | | | | |

Organizational title of position (if any)

10. Allocations

Department Health, Education, and Welfare

b. Second subdivision
Bureau of Hearings and Appeals

Social Security Administration

c. Third subdivision
Division of Field Operations

First subdivision
Social Security Administration

d. Fourth subdivision

This is a complete and accurate description of the duties and responsibilities of this position

e. Fifth subdivision

_____
(Signature of immediate supervisor) (Date)

f. Sixth subdivision

Certification by head of bureau/office, or designated representative

14. Classification Approval: DHEW/SSA

/S/ Robert M. Ball 3-20-67
(Signature) (Date)
Commissioner of Social Security

/S/ William Director 4-10-67
(Signature) (Date)
Title: Chief, Classification Branch

Description of duties and responsibilities (Attached)

Substantial change has occurred [ ] YES [ ] NO

16. Organizational Approval: (Date)

Title changed per Federal Register 8-19-72

02537

| Level of Supervision | 18. Security Clearance, if any | 19. Incumbents of this position are required to file a statement of employment and financial interest. | 20. Competitive Level |
|---|---|---|---|
| FIRST | [ ] CONFIDENTIAL | | |
| SECOND | [ ] SECRET | [ ] YES [ ] NO | |
| THIRD | [ ] TOP SECRET | See reverse side for correct number of positions. | |

If more space is required, use the other side and additional pages, size 8 x 10½.

XXUT

BUREAU OF HEARINGS AND
APPEALS SOCIAL SECURITY
ADMINISTRATION

POSITION DESCRIPTION

ADMINISTRATIVE LAW JUDGE
(LICENSING AND BENEFITS)

## I. INTRODUCTION

Administrative law judges within the Department of Health, Education, and Welfare, Social Security Administration, Bureau of Hearings and Appeals, are located throughout nine geographically dispersed DHEW regions, encompassing the entire United States and Puerto Rico. Administrative law judge offices are established in 60 major cities throughout the nation.

Under the direct delegation from the Secretary of Health, Education and Welfare, and in the manner prescribed by the Administrative Procedure Act, the administrative law judge holds hearings and makes and issues decisions on appeals from determinations made in the course of administration of Titles II and XVIII of the Social Security Act. The basic types of cases are: (a) appeals by individuals from determinations dealing with entitlement to disability benefits under Title II; (b) appeals under Title II involving entitlement of individuals to old age and survivors' benefits; (c) appeals by hospitals and various health and care institutions and agencies dissatisfied with the determination that they do not meet the licensing and regulatory provisions covering "Providers of Services" under Title XVIII; and (d) appeals by individuals from determinations involving entitlement and/or amount of hospital services or medical and health services. Since cases are assigned on a rotation basis, each administrative law judge handles all types of cases regardless of the degree of difficulty or complexity of the issues.

Administrative law judges' decisions are final decisions of the Secretary unless subsequently reviewed as provided in the regulations. They either affirm, modify, or reverse any previous determinations and are issued and forwarded directly to the parties in the administrative law judge's own name.

## II. DUTIES AND RESPONSIBILITIES

Under the provisions of Titles II and XVIII of the Social Security Act and applicable Federal, State, and foreign laws, and in conformity with the Administrative Procedure Act, and with full and complete individual independence of action and decision, and without review, the administrative law judge has full responsibility and authority to (1) dismiss or allow requests for hearings and rule on requests for extensions; (2) identify problems and issues to be resolved; (3) analyze all previously developed evidence and appraise previous licensing, regulatory, and adjudicative processes by the administrative agency; (4) determine whether there are other parties with adverse interest to be joined in the case; (5) issue subpoenas and rule on petitions to revoke subpoenas; (6) correlate and resolve conflicting evidence; (7) hear testimony and rule on all motions, petitions, or exceptions involving questions of law, procedure, and the admissibility of evidence; (8) hold prehearing conferences with the appellant and/or his counsel and the government representative; (9) make all evidence of record available to the parties and inform them of any evidence or expert testimony required in connection with a material point or issue; (10) administer oaths and affirmations; (11) govern the conduct of the parties at the hearing, and in general regulate the entire course of the proceedings; (12) control the examination and cross-examination of witnesses; (13) introduce into the record documentary and other evidence deemed necessary for the completion or full development of the record; (14) hear oral argument, and receive and consider briefs that are submitted; (15) appraise the credibility of witnesses, and resolve conflicts in lay and expert evidence; (16) consider and dispose of proposed findings of fact and conclusions of law submitted by the claimant's or government representatives; (17) make findings of fact on each issue, giving the reasons therefore and render conclusions of law as sole trier of fact and law; (18)

fully consider all the evidence of record and issue decisions within the requirements of the Administrative Procedure Act, which decisions are completely independent and final, signed only by him, and published to parties in interest without prior review; and (19) entertain petitions for attorney's fees and issue orders designating the amount of fee permitted.

The administrative law judge may also take other action not inconsistent with the Administrative Procedure Act such as perfecting a record or presiding at hearings and issuing decisions in matters remanded by the Federal courts. Administrative law judges also hear and decide cases arising under Title VI of the Civil Rights Act of 1964 involving providers of service, and may act as administrative law judge for other administrative agencies (on assignment by the Civil Service Commission) to hear and decide Title VI cases.

## III. SUPERVISION AND GUIDANCE

The Social Security and Administrative Procedure Acts prohibit substantive review and supervision of the administrative law judge in the performance of his quasi-judicial functions. His decisions may not be reviewed before publication, and after publication only by the Appeals Council in certain prescribed circumstances. He is subject only to such administrative supervision as may be required in the course of general office management. His decisions take into account all applicable Federal, State, and foreign laws, statutes, regulations, rulings, and decisions of the Federal courts.

In cases involving the licensing of "Providers of Services" under Title XVIII, the administrative law Judge's decision can only be reviewed at the request of a party (the institution involved or the government). In other cases, a decision can be reviewed at the request of a claimant, or by the Council on its own motion. In any event, the Council takes jurisdiction only on a certiorari basis. Final decisions of the administrative law judge may be appeals to the Federal courts, and the Social Security Act (Sec. 205(g)) requires that courts up-hold the administrative law judge's finding of fact when supported by substantial evidence.

## IV. SPECIAL KNOWLEDGE AND ABILITIES REQUIRED

The administrative law judge must have expert knowledge of judicial practice; exceptional professional attainment; a capacity for analysis and articulation; the ability to balance important and conflicting considerations; a proven ability to assure a fair hearings; and be able to discharge effectively the responsibilities placed upon him for bringing all matters coming before him to a prompt and just final decision. Inherent demands of the job include such characteristics as tact, poise, firmness, impartiality, diplomacy, originality, imagination, initiative, professional bearing, the ability to control the emotionalism of opposing counsel, claimants, witnesses, or other individuals whose conduct may threaten the orderly conduct of the proceedings; and he must possess the ability to meet novel and taxing legal problems. The administrative law judge is required to appraise the issues promptly and thoroughly before any testimony is adduced. If the pleadings are insufficient the administrative law judge must have the necessary legal ability to take any and all action required to clarify the issues. With the issues defined, he will exercise initiative in obtaining stipulations of fact. Since, unlike a judge, an administrative law judge has no contempt powers, poise and diplomacy in meeting delicate situations are essential.

The administrative law judge must obtain a clear and concise record, containing all relevant facts, while excluding all immaterial matters. He must use judgment and initiative in the calling of expert or other witnesses and in requesting either the government representative or the appellants' counsel for evidence on any material point at issue. A broad knowledge of all technical, legal, medical, and economic factors involved is necessary in order that the administrative law judge may develop a complete record of the hearing.

The administrative law judge must be aware of current practices in the fields of medical treatment, hospital administration, costs of medical services, safety standards, and like matters in order to render well informed and proper decisions in regulatory and licensing proceedings under Title XVIII. His decisions have a substantial impact upon the Administration's policies and procedures in this health insurance program in which there is a great deal of public interest.

In the disability program under Title II, the administrative law judge must decide cases involving a wide variety of physical and mental impairments, and the effect such impairments have on the ability of an individual to work. To reach informed judgments in these cases, the administrative law judge must possess a knowledge of the medical, psychological, and vocational factors involved in each case. The administrative law judge called upon to perform in this program must develop a background in the medicolegal field not normally inherent in other legal positions in the Government service.

In old age and survivors' benefit cases, the administrative law judge is required to have extensive knowledge of State, Federal and foreign laws dealing with difficult and complex questions in such fields as conflicts of law, domestic relations, descent and distribution, employer-employee relations, contracts, trusts, partnerships, corporations, accounting, and related subjects. For example, in the Social Security Act there are a number of express references to the Internal Revenue Code, the Immigration and Naturalization Act, the Agricultural Marketing Act, and other laws. In the Internal Revenue field alone, the administrative law judge is required to have the necessary expertise to make findings on such matters as adjusted gross and net income; evasion and avoidance of taxes; whether there exists a bona fide corporation or partnership; and the reasonableness of salaries paid to corporate officers. The administrative law judge is not bound in such cases by findings of the Treasury Department or other Government agencies.

The increasing interest by the courts in the interrelated medical and vocational factors has made it necessary to utilize oral testimony of vocational and medical experts, most of whom are eminent authorities in their respective fields. He is the sole person charged with evaluating the credibility of witnesses in making a judgment on the evidence developed at the hearing. The administrative law judge is required to have the skillful and comprehensive interrogation of expert witnesses. He must be able to analyze and summarize in decisional format complex facts and laws clearly and concisely, and to create a dignified and objective atmosphere at the hearing.