**W.C., Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**No. C83–865R.**

United States District Court, W.D. Washington, at Seattle.

Oct. 28, 1985.

Order Granting Relief Jan. 15, 1986.

William Rutzick, Kristin M. Houser, Schroeter, Goldmark & Bender, Seattle, Wash., for plaintiff.

Robert M. Taylor, Asst. U.S. Atty., Seattle, Wash., for defendant.

ORDER GRANTING PLAINTIFF'S
MOTION FOR PARTIAL
SUMMARY JUDGMENT

ROTHSTEIN, District Judge.

THIS MATTER comes before the court on cross motions for summary judgment. These motions were referred to Magistrate Philip K. Sweigert, who has now filed a detailed Report and Recommendation. The court has carefully considered the Report and Recommendation and all the materials submitted by the parties in response thereto. The court has also studied the relevant file and records.

This action is composed of two claims for relief. First, plaintiff seeks reversal of a decision by the Secretary of Health and Human Services to terminate his disability benefits under Title II of the Social Security Act and his Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. Plaintiff alleges that this decision is not supported by substantial evidence and is based on errors of law. Second, plaintiff, as representative of a class of individuals seeking disability and SSI benefits, challenges the validity of the so-called Bellmon Review Program implemented by the Secretary in 1981. Plaintiff alleges that the adoption of the Bellmon Review Program violated the notice and comment requirements of the Administrative Procedure Act ("APA").

## I. FACTUAL BACKGROUND

Plaintiff received disability and SSI benefits for a number of years. On February 17, 1982, the Social Security Administration ("SSA") terminated his benefits based on a determination that his disability had healed and that, therefore, he was able to return to work. Plaintiff requested and received a hearing before an administrative law judge ("ALJ"). The ALJ found that plaintiff's disability continues, and he reversed the termination of plaintiff's benefits. Review of this ALJ decision was initiated on July 14, 1982, by a motion of the SSA Appeals Council, the body that issues final decisions on behalf of the Secretary of Health and Human Services. On April 21, 1983, the Appeals Council reversed the ALJ decision and terminated plaintiff's benefits.

It is undisputed that the ALJ decision in plaintiff's case was reviewed under the Bellmon Review Program. This program was implemented by the Secretary in response to the Bellmon[1] Amendment to the Social Security Act. The Bellmon Amendment provides:

> The Secretary of Health and Human Services shall implement a program of reviewing, on his own motion, decisions rendered by administrative law judges as a result of hearings under section 221(d) of the Social Security Act, and shall report to the Congress by January 1, 1982, on his progress.

Social Security Disability Amendments of 1980, Pub.L. No. 96–265, § 304(g), 94 Stat. 441, 456. The Bellmon Amendment grew out of congressional concerns about the increasing number of disability decisions being appealed to ALJs, the high number of allowance decisions issued by ALJs, the accuracy of those decisions, and the policy

that only ALJ decisions denying claims were subject to review. H.R.Rep. No. 944, 96th Cong., 2d Sess. 57, *reprinted in* [1980] U.S.Code Cong. & Ad.News 1392, 1405; S.Rep. No. 408, 96th Cong., 2d Sess. 53, *reprinted in* [1980] U.S.Code Cong. & Ad.News 1277, 1331.

In response to the Bellmon Amendment, the Secretary established the Bellmon Review Program, which was announced in Social Security Ruling ("SSR") 82–13.[2] The program was described in detail in a memorandum,[3] dated September 24, 1982, from Louis B. Hays, Associate Commissioner of the SSA Office of Hearings and Appeals, to all SSA ALJs. According to the Hays memorandum, the program was begun on October 1, 1981. The program provided for own-motion review of ALJ decisions allowing disability benefits under Title II of the Social Security Act or allowing both disability and SSI benefits under Titles II and XVI of the Social Security Act. ALJs with individual allowance rates[4] of 70 percent or higher and ALJs in hearing offices with aggregate allowance rates of 74 percent or higher were targeted for review. Half of the allowance decisions issued by targeted ALJs were evaluated by the Office of Hearings and Appeals for possible review, and 7½ percent of the allowance decisions issued by these ALJs were formally reviewed by the Appeals Council. On April 1, 1982, the targeted ALJs were divided into four groups based on own-motion rates.[5] Each and every allowance decision by ALJs in the group with the highest own-motion rates was evaluated for possible review. In the group with the second-highest rates, 75 percent of the ALJs' allowance decisions were thus evaluated; in the group with the third-highest rates, 50 percent; and in the group with

---

1. The amendment is named after Senator Henry Bellmon, the amendment's principle proponent in the Senate.

2. Attachment A to Report and Recommendation of July 11, 1985.

3. Attachment B to Report and Recommendation of July 11, 1985.

4. An ALJ's allowance rate during a given period is the number of claims for benefits he upholds divided by the total number of decisions he issues.

5. An ALJ's own-motion rate during a given period is the number of his decisions corrected by the Appeals Council on own-motion review divided by the total number of his decisions evaluated for possible own-motion review.

the lowest rates, 25 percent. In addition, the program was expanded so that 15 percent of all allowance decisions by targeted ALJs were formally reviewed by the Appeals Council. Finally, the program was expanded to provide review of a national random sample of ALJ allowance decisions, ALJ decisions referred from the SSA Office of Disability Operations, and decisions of all new ALJs.

While the record does not clearly set forth more recent developments concerning the Bellmon Review Program, the court understands that in early 1983 the Secretary ceased to target ALJs for review based on allowance rates. The Secretary continued, however, to target ALJs for review based on own-motion rates calculated from cases evaluated or reviewed as part of the national random sample. For a brief period, The Bellmon Review Program included some unappealed denial decisions issued by ALJs with high grant-review rates.[6] On June 21, 1984, the Secretary eliminated from the Bellmon Review Program all review targeted at particular ALJs on the basis of prior performance.

Under the Bellmon Review Program, four ALJs in the State of Washington were targeted for review beginning October 1, 1981. Attachment to Letter of November 4, 1982, from P.J. Kurapka to William Rutzick, filed as Attachment to Declaration of Kristin Houser, May 3, 1984. Two more, including ALJ George W. Wise, who heard plaintiff's case, were targeted based on allowance rates for the six-month period ending January 1, 1982. *Id.* The ALJ decision in plaintiff's case was therefore among the decisions reviewed by the Appeals Council as a consequence of the decisionmaker's high allowance rate.

Plaintiff filed this action on June 24, 1983. In the Complaint, plaintiff alleges that the Appeals Council decision to termi-

nate his benefits was not supported by substantial evidence and was based on errors of law. He therefore seeks reversal of the Appeals Council decision. He further alleges that the Bellmon Review Program, as outlined in SSR 82–13 and the Hays memorandum, was improperly adopted without APA notice and comment procedures. He therefore seeks an injunction against enforcement of all Appeals Council decisions in cases reviewed under the Bellmon Review Program.[7] Plaintiff's APA claim focuses on the Secretary's former practice of targeting high allowance ALJs for own-motion review. For purposes of this Order, therefore, the term "Bellmon Review Program" will ordinarily refer to prior versions of the program in which ALJs were targeted for review based on allowance rates.

On September 21, 1983, plaintiff moved for class certification with respect to his APA claim. On October 26, 1983, the Secretary moved to remand plaintiff's individual claim for benefits in accordance with a preliminary injunction issued in *Morrison v. Heckler*, 582 F.Supp. 321 (W.D.Wash. 1983), a class action in which plaintiff was an unnamed class member. Pursuant to the *Morrison v. Heckler* preliminary injunction, the Secretary was to reconsider all class members' cases on a priority basis and determine whether her denial of benefits to each class member was consistent with certain Ninth Circuit decisions to which she had not acquiesced. In pertinent part, these Ninth Circuit decisions deal with the issues of medical improvement and uncontradicted treating physician opinion. By the Order of January 25, 1984, the court denied the Secretary's motion to remand and certified a class defined as follows:

All claimants within the State of Washington for Title II Social Security disability benefits or Title XVI Supplemental

---

6. An ALJ's grant-review rate during a given period is the number of cases in which the Appeals Council grants a claimant's request for review of the ALJ's decision divided by the total number of cases in which a claimant requests review.

7. In addition, plaintiff originally sought to enjoin the Secretary from further own-motion review targeted at high allowance ALJs. As such review has now ceased, however, this aspect of plaintiff's claim is moot.

Security Income benefits who have received (or who receive during the pendency of his litigation) decisions from ALJ's reversing initial denials or terminations of disability and whose cases are then reviewed by the Appeals Council on its own motion pursuant to the Bellmon Amendment.

However, the court stayed proceedings for 60 days so that the Secretary might reconsider her termination of plaintiff's benefits. On March 19, 1984, the Appeals Council issued a supplemental decision which states that the termination of plaintiff's benefits is proper under Ninth Circuit law concerning medical improvement and uncontradicted treating physician opinion.

Plaintiff now moves for partial summary judgment on the class APA claim. The Secretary moves for summary judgment on both plaintiff's individual claim and the class APA claim.

## II. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Magistrate recommends that the court grant plaintiff's motion for partial summary judgment on the class claim that the Bellmon Review Program was adopted in violation of APA notice and comment requirements. The Secretary objects to this recommendation on the grounds that the court lacks jurisdiction over the class claim and that the Bellmon Review Program is exempt from notice and comment requirements.

### A. Jurisdiction

The Secretary asserts that the Disability Reform Act of 1984, P.L. 98–460, § 2(d)(2), 98 Stat. 1794, 1797–98, requires remand of plaintiff's individual claim and that such remand will leave the class without a representative and require dismissal of the class claim. As the Magistrate points out, however, the Disability Reform act requires remand only "in actions relating to medical improvement." *Id.,* 98 Stat. at 1798. Such actions are defined as those,

raising the issue of whether an individual who has had his entitlement to benefits under title II, XVI, or XVIII of the Social Security Act based on disability terminat-ed (or period of disability ended) without consideration of whether there has been medical improvement in the condition of such individual (or another individual on whose disability such entitlement is based) since the time of a prior determination that the individual was under a disability.

*Id.* at § 2(d)(6), 98 Stat. at 1798. In the supplemental decision of the Appeals Council, the issue of possible medical improvement in plaintiff's condition was explicitly considered. Therefore, plaintiff's individual claim does not relate to medical improvement for purposes of the Disability Reform Act, and remand is not required.

The Secretary also asserts that plaintiff's APA claim is moot because his case already has been remanded to the Secretary and reviewed apart from the Bellmon Review Program. As plaintiff's APA claim is moot, the Secretary argues, plaintiff is no longer a proper representative for the class, and the class claim must be dismissed. *See General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 2370, 72 L.Ed.2d 740 (1982) (named plaintiff must suffer same injury as class members). *Cf. Sosna v. Iowa,* 419 U.S. 393, 402, 95 S.Ct. 553, 559, 42 L.Ed.2d 532 (1975) (dictum that named plaintiff's stake in action ordinarily must continue throughout litigation). It is incorrect, however, to say that plaintiff's case was remanded to the Secretary. During a stay in this action, the Appeals Council issued a supplemental decision dealing with issues identified in the *Morrison v. Heckler* preliminary injunction. But the Appeals Council's original decision, a product of the Bellmon Review Program, remains *sub judice.* Therefore, plaintiff still has a stake in the class claim challenging the Bellmon Review Program and may continue to serve as class representative.

Finally, the Secretary asserts that numerous class members do not meet the prerequisites of 42 U.S.C. § 405(g) (1982) ("Section 405(g)"), which provides that a claimant may obtain judicial review of a denial of disability benefits only upon a

final decision by the Secretary and only if he seeks review within sixty days after the decision is mailed to him. *See Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 2557–58, 61 L.Ed.2d 176 (1979) (each class member must satisfy Section 405(g) requirements). The court agrees with the Magistrate's conclusion that Section 405(g) does not bar class treatment of plaintiff's APA claim.

Clearly, all class members have received final decisions from the Secretary. Under the court's Order of January 25, 1984, the class is defined to include only individuals whose claims for disability have been reviewed by the Appeals Council, which issues final decisions on behalf of the Secretary.

Furthermore, the court believes that, with respect to the class claim, the sixty-day requirement is tolled by the Secretary's failure to publish the aspects of the Bellmon Review Program that are the focus of the class claim.[8] SSR 82–13, which announced the Bellmon Review Program, does not suggest that ALJs were to be targeted for review based on allowance rates. The Hays memorandum, which informed ALJs of the details of the program, was not circulated except among ALJs. As a result, class members cannot be charged with notice that the ALJs who heard their claims were targeted for review based on allowance rates. *See Stieberger v. Heckler*, 615 F.Supp. 1315, 1332–34 (S.D.N.Y. 1985). Class members were entitled to believe that Appeals Council review of particular ALJ decisions was based solely on the general criteria set forth in published regulations, or perhaps on the idiosyncratic exercise of discretion, but not on specfic criteria set forth in an unpublished rule. It would simply be unfair, therefore, to bar

any class members from this action based on the sixty-day requirement. *Id.*

Even if the sixty-day requirement were not tolled, class treatment of plaintiff's APA claim would not be defeated entirely. The sixty-day requirement is satisfied by all class members who received notice of final decisions in their respective cases on or after April 25, 1983, sixty days before plaintiff filed this action. *Cf. Lopez v. Heckler*, 725 F.2d 1489, 1506–07 (9th Cir.), *vacated on other grounds and remanded*, —— U.S. ——, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984). The APA claim on behalf of these class members could not be dismissed under Section 405(g).

■ In summary, the court agrees with the Magistrate that the court has jurisdiction over the class claim. The court must therefore consider the merits of plaintiff's motion for partial summary judgment.

## B. APA Notice and Comment

It is undisputed that the Bellmon Review Program is a rule for APA purposes. *See* 5 U.S.C. § 551(4) (1982). Therefore, adoption of the program presumptively requires notice and comment procedures. 5 U.S.C. § 553(b), (c) (1982). It is also undisputed that the Bellmon Review Program was adopted without notice and comment. Unless the program is exempt from such procedure, therefore, the program is invalid. *See Buschmann v. Schweiker*, 676 F.2d 352, 355–56 (9th Cir.1982); *Western Oil & Gas Ass'n v. Environmental Protection Agency*, 633 F.2d 803, 812–13 (9th Cir. 1980).

As a general matter, exceptions to APA notice and comment requirements are "narrowly construed and reluctantly countenanced." *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir.1984). The Secretary contends that the Bellmon Review Program

---

8. The Secretary argues that the sixty-day requirement is jurisdictional and must be enforced strictly. Upon thorough review of the recent case law on Section 405(g), the Magistrate concludes that the sixty-day requirement is not jurisdictional and is subject to equitable tolling. *See Lopez v. Heckler*, 725 F.2d 1489, 1505–07 (9th Cir.), *vacated on other grounds and*

*remanded*, —— U.S. ——, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984); *Borzeka v. Heckler*, 739 F.2d 444, 448 n. 3 (9th Cir.1984); *City of New York v. Heckler*, 742 F.2d 729, 738 (2d Cir.1984), *rehearing denied*, 755 F.2d 31 (1985). The court agrees with the Magistrate and adopts his reasoning.

fits within the exception provided in 5 U.S.C. § 553(b)(A) (1982), which states that notice and comment requirements do not apply to "interpretive rules, general statements or policy, or rules of agency organization, procedure, or practice." In particular, the Secretary asserts that the Bellmon Review Program is either an interpretive rule or a procedural rule.

### 1. Interpretive Rule Exception

Interpretive rules are those that merely clarify existing law or regulations. *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir.1983). An agency promulgates interpretive rules without exercising delegated legislative power to make law through rules. 2 K. Davis, *Administrative Law Treatise*, § 7:8, 36 (2d ed. 1979). *See Stoddard Lumber Co., Inc. v. Marshall*, 627 F.2d 984, 987 (9th Cir.1980). In contrast, legislative rules are those that effect a change in existing law or policy. *Powderly*, 704 F.2d at 1098. An agency must exercise delegated legislative power in order to promulgate legislative rules. *Louisiana-Pacific Corp. v. Block*, 694 F.2d 1205, 1209–10 (9th Cir.1982).

SSR 82–13 states that the Bellmon Review Program is the Secretary's response to the Bellmon Amendment, which directs the Secretary to implement a program of own-motion review of ALJ decisions. SSR 82–13 also cites as authority 42 U.S.C. § 405 (1982), which, *inter alia,* provides for promulgation of procedural rules governing claims for disability benefits and for own-motion review of particular cases at the discretion of the Secretary. The question is whether the Bellmon Review Program, as outlined in SSR 82–13 and the Hays memorandum, was merely an interpretation of existing law, including the Bellmon Amendment, or instead constituted new law promulgated through exercise of delegated legislative power. In other words, the court must determine whether the Bellmon Amendment or any other statute delegated legislative power to the Secretary and, if so, whether the Secretary

exercised such power when she implemented the Bellmon Review Program.

The court agrees with the Magistrate's conclusion that the Bellmon Amendment delegates legislative power. The language of the amendment directing the Secretary to "implement a program" clearly contemplates the creation of rules beyond anything Congress was prepared to project or anticipate. Nothing in the amendment prescribes any particular strategy or procedure. The required program must be devised in the first instance by the Secretary, not gleaned from the words of Congress.

The Secretary argues that Congress did not intend the Bellmon Amendment to delegate legislative power. If Congress had intended to delegate such power, the Secretary argues, Congress would have expressly authorized promulgation of legislative rules. The court fails to see a significant difference between language requiring promulgation of rules and language requiring implementation of a program. A program is just a set of rules. Moreover, the failure of Congress to specify in the Bellmon Amendment that the Secretary may promulgate rules to systematize own-motion review may stem from the knowledge that 42 U.S.C. § 405(a) (1982) already provides the Secretary with authority to promulgate rules of procedure.

The court also agrees with the Magistrate's conclusion that the Bellmon Review Program reflects an exercise of legislative power. It is clear that the program was established pursuant to the Bellmon Amendment, which the court considers delegative. It is also clear that the Bellmon Amendment does not require or suggest that the Secretary target ALJs for review based on allowance rates. In fact, all reference to allowance rates was purposefully deleted from the amendment prior to enactment. H.R.Rep. No. 944, 96th cong., 2d Sess. 57, *reprinted in* [1980] U.S. Code Cong. & Ad.News 1392, 1405. Insofar as the Secretary decided to implement a program of review based on allowance

rates, therefore, the Secretary created new law.[9]

Since 1981, the Secretary has implemented at least four substantial revisions of the Bellmon Review Program. These frequent revisions tend to confirm that the Secretary has been developing her own program, not simply attempting to flesh out a congressional plan.

The Secretary argues that the Bellmon Review Program is interpretive of the Secretary's discretionary own-motion review authority as provided in 42 U.S.C. § 405(b) (1982). The court rejects this argument for two reasons. First, the Bellmon Review Program reflects a dramatic change in policy. Rules that effect a change in policy are ordinarily considered legislative. *Powderly,* 704 F.2d at 1098: *American Trucking Ass'n, Inc. v. United States,* 688 F.2d 1337, 1348 (11th Cir.1982), *rev'd in part on other grounds,* 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984); *Brown Express, Inc. v. United States,* 607 F.2d 695, 702 (5th Cir.1979). It is undisputed that the Secretary's own-motion review power had been for years exercised only rarely. Second, the program severely limited the Secretary's discretion *not* to evaluate or review decisions by targeted ALJs. Evaluation for own-motion review became essentially mandatory first for half of the decisions issued by high allowance ALJs and later for all of the allowance decisions issued by some of these ALJs. A rule that severely limits agency discretion is not merely interpretive. *See Guardian Fed. Savings & Loan Ass'n v. Federal Savings & Loan Ins. Corp.,* 589 F.2d 658, 666–67 (D.C.Cir.1978); *Pickus v. United States Board of Parole,* 507 F.2d 1107, 1113 (D.C. Cir.1974).

*2. Procedural Rule Exception*

In general, procedural rules relate to an agency's internal operations. *Batterton v.* *Marshall,* 648 F.2d 694, 707 (D.C.Cir.1980). The distinguishing characteristic of procedural rules is that they do not alter private rights or interests, although they may alter the manner in which parties present themselves or their viewpoints to an agency. *Id.* The procedural rule exception to APA notice and comment requirements does not apply to rules that impact substantial private rights or interests. *Id.* at 708; *National Ass'n of Home Health Agencies v. Schweiker,* 690 F.2d 932, 949 (D.C.Cir. 1982), *cert. denied,* 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983); *Brown Express, Inc. v. United States,* 607 F.2d 695, 702 (5th Cir.1979).[10]

The question is whether the Bellmon Review Program, as outlined in SSR 82–13 and the Hays memorandum, jeopardized private rights. The Magistrate takes the position that the program jeopardized such rights by compromising the decisional independence of ALJs. In other words, the Magistrate feels that the program pressured certain ALJs not to allow benefits in close cases.

The court concludes that the Bellmon Review Program was not a procedural rule because the ultimate purpose of the program was to change the outcome of agency decisions. According to the Hays memorandum, the program was "intended to promote greater consistency and accuracy" among ALJ decisions. The program was to accomplish this goal in at least two ways. First, erroneous decisions were to be corrected upon review. Provisions for review are procedural. Second, the performance of ALJs was to be "improved" prospectively. It is this envisioned prospective impact on ALJ decisions that threatened the substantive rights of disability claimants. To increase "consistency

---

**9.** As the Magistrate points out, portions of SSR 82–13 merely clarify policy as to review on grounds set forth in 20 C.F.R. §§ 404.970, 416.-1470. These portions of SSR 82–13 are interpretive.

**10.** In *Rivera v. Becerra,* 714 F.2d 887, 891 (9th Cir.1983), *cert. denied,* 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 124 (1984), the Ninth Circuit held that substantial impact on private rights is not an independent basis on which to require notice and comment. The Ninth Circuit did not hold that such impact is not a factor in determining whether a particular rule fits within a statutory exception to notice and connection requirements. *See, e.g., Cabais v. Egger,* 690 F.2d 234, 237 (D.C.Cir.1982).

and accuracy" among future decisions is to effect a deliberate, systematic change in the results of individual cases at the ALJ level. Such change is inherently substantive. Because the program focused on high allowance ALJs, the anticipated type of change was a reduction in the number of allowances.[11] Even if this anticipated reduction was salutary in the sense that future decisions would more thoroughly conform to each other or better reflect agency positions on legal issues, reduction of allowances is a substantive policy, not merely a matter of procedure.

One of the ways in which the Bellmon Review Program impacted future decisions was through a feedback system by which the Appeals Council disseminated analyses of the performance of certain high allowance ALJs.[12] The Hays memorandum states:

> An essential requirement to ensure the success of the Bellmon review program is to provide a companion system for providing feedback on the results of the review.... The purpose of the feedback system is to advise affected ALJs of decisional weaknesses and to provide a mechanism for achieving long term improvement.

Attachment B to Report and Recommendation of July 11, 1985, at 3. The court believes that the anticipated "long term improvement" was reduction of allowance rates. This belief is supported by certain other SSA internal correspondence [13] and by the official SSA position that high allowance rates entail high error rates.[14] It is also supported by common sense. To designate particular high allowance ALJs for ongoing review of their allowance decisions inexorably tends to discourage these ALJs from allowing benefits in close cases. There exists substantial evidence suggest-

---

**11.** Through correspondence from Levi J. Ogden, Director of the SSA Office of Appraisal, Louis B. Hays was kept apprised of targeted ALJs' allowance rates, which declined during the Bellmon Review Program. *Social Security Reviews: The Role of the Administrative Law Judge,* S.Hrg. 98–296 Before the Committee on Governmental Affairs, 98th Cong., 1st Sess. 214 (1983). ("Committee Hearings"). In a letter of June 29, 1982, from Ralph F. Ives, Jr., Acting Director of the SSA Office of Management Coordination, to Louis B. Hays, Ives describes lowered aggregate allowance rates as an SSA objective and treats the Bellmon Review Program as a means to achieve this objective. Attachment to Declaration of Kristin Houser, May 3, 1984. *See also* Attachment A to Declaration of William Rutzick, September 21, 1983 (with attached graphs). The Ives letter analyzes allowance rate trends in considerable detail. *Id.* According to SSA figures, 46 ALJs were removed from the Bellmon Review Program on various dates during the period from April 15, 1982, to June 7, 1983. Committee Hearings at 253–54. Of these 46, all but five had lower allowance rates prior to removal than they had had prior to selection for the Bellmon Review Program. *Id.* Of the ALJs who had lower allowance rates prior to removal, 19 had allowance rates at least 10 percent lower; five had allowance rates 20–50 percent lower. *Id.*

**12.** In the Declaration of Louis B. Hays prepared for *Association of Administrative Law Judges, Inc. v. Schweiker,* Civ. No. 83–0124 (D.D.C.), Hays describes the feedback system as follows:

> As a result of the own-motion review program, we now have a greatly enhanced capability to improve the quality of decisions at the hearing level. The ALJs whose decisions are reviewed receive direct feedback regarding their errors through the case remand process and the distribution of the Appeals Council's own-motion orders. We have also established a system to disseminate individualized analytical reports dealing with the ALJs. This feedback system points out the errors which caused the Appeals Council to reverse or remand an ALJ's decisions and does not direct the ALJ to make fewer allowance decisions. At the present time this feedback system is directed toward ALJs selected for 100 percent Bellmon review; however, it will be used for any ALJ who is found to have a high own-motion rate.

Attachment to Declaration of Kristin Houser, May 3, 1984.

**13.** See Note 11, *supra.*

**14.** Implementation of Section 304(g) of Public Law 96–265, "Social Security Amendments of 1980": Report to the Congress by the Secretary of Health and Human Services 21–23 (1982), filed as Attachment to Declaration of Kristin Houser, May 3, 1984. *See also Social Security Disability Reviews: The Role of the Administrative Law Judge,* S.Hrg. 98–296 Before the Committee on Governmental Affairs, 98th Cong., 1st Sess. 258–260 (1983).

ing that ALJs in fact felt pressured to deny claims for disability benefits.[15]

Other courts have found that the Bellmon Review Program created an atmosphere of tension and unfairness among ALJs that could have corrupted some ALJs' ability to decide cases impartially. *Association of Administrative Law Judges, Inc. v. Heckler*, 594 F.Supp. 1132, 1143 (D.D.C.1984); *Stieberger v. Heckler*, 615 F.Supp. 1315, 1394–95 (S.D.N.Y.1985). In addition, the Senate Subcommittee on Oversight of Government Management of the Committee on Governmental Affairs has found that under the Bellmon Review Program and other concurrent policies the Secretary was "pressuring . . . ALJs to reduce the rate at which they allow disabled persons to participate in or continue to participate in the Social Security disability program . . . ." Staff of Senate Comm. on Governmental Affairs, 98th Cong., 1st Sess. "The Role of the Administrative Law Judge in the Title II Social Security Disability Insurance Program" 36 (Comm.Print 1983) ("Subcommittee Report"). The Subcommittee concluded that the Secretary's focus on allowance rates in the Bellmon Review Program resulted in "less impartial and fair hearings for some disability claimants . . . ." *Id.*[16]

The Secretary asserts that her records show no significant reduction in aggregate allowance rates during the Bellmon Review Program. It is not entirely clear whether this is true. Allowance rates declined slightly in fiscal years 1981–83 after eight straight years of steady increases.[17] One might infer, therefore, that but for the Bellmon Review Program allowance rates would have risen. Moreover, SSA statistics cited in the Subcommittee Report indicate a substantial decline in allowance rates among targeted ALJs.[18] Certainly, this decline might well be considered significant.

Whether or not a significant decline in allowance rates occurred, the court does not believe that mere statistics should govern the court's characterization of the Bellmon Review Program as substantive or procedural. Allowance rates may prove nothing. *Cf. Matthews v. Eldridge*, 424 U.S. 319, 346, 96 S.Ct. 893, 908, 47 L.Ed.2d 18 (1976) ("Bare statistics rarely provide a satisfactory measure of the fairness of a decisionmaking process."). The court's characterization of the program must be based on the program's essential purpose and reasonably foreseeable consequences. Insofar as one of the purposes of the program was to influence future ALJ decisions, the court has concluded that the program was substantive, not procedural. This conclusion need not rest on a finding

15. *See, e.g.,* Affidavit in Support of Motion for Temporary Restraining Order prepared for *Association of Administrative Law Judges, Inc. v. Schweiker*, 594 F.Supp. 1132, (D.D.C.) at 9–11, filed as Attachment to Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment or in the Alternative for Preliminary Injunction, May 3, 1984; *Social Security Disability Reviews: The Role of the Administrative Law Judge*, S.Hrg. 98–296 Before the Committee on Governmental Affairs, 98th Cong., 1st Sess. 286, 294–97 (1983) (Statement of Joyce Krutick Barlow).

16. The Secretary asserts that the conclusions stated in the Subcommittee Report were based on misinterpretation of the relevant statistics. The court does not agree that the Subcommittee's conclusions were based entirely on statistics. On the contrary, statistics appear to have played only a minor role in the Subcommittee's consideration of the Bellmon Review Program. It appears, however, that one of the introducto-

ry assertions by Senators Cohen and Levin—that the aggregate allowance rate for SSA ALJs dropped from 67.2 percent in mid-1982 to 51.9 percent in mid-1983—may have been erroneous. *See* Subcommittee Report at III. This problem is discussed thoroughly in *Stieberger v. Heckler*, 615 F.Supp. 1315, 1393–94 (S.D.N.Y.1985).

17. From the fiscal year 1974 through fiscal year 1980, the aggregate allowance rates among SSA ALJs rose from 45.9 percent to 61.8 percent. Exhibit 2 to Defendant's Objections to Magistrate's Report and Recommendation, filed August 12, 1985. By the end of fiscal year 1983, the aggregate allowance rate had fallen to 58.3 percent.

18. According to SSA figures, the allowance rates of targeted ALJs declined from 74 percent in April, 1981, to 70 percent in October, 1981, to 64 percent in March, 1982. Subcommittee Report at 15.

that such influence was demonstrably effective.

### 3. Conclusion

██ As the Bellmon Review Program was neither an interpretive rule nor a procedural rule, adoption of the program required APA notice and comment procedures under 5 U.S.C. § 553(b), (c) (1982). These procedures were not used, and adoption of the program was therefore invalid.[19] Accordingly, plaintiff's motion for partial summary judgment must be granted. The court will set this matter down for a hearing on the question of appropriate relief.

## III. SECRETARY'S MOTION FOR SUMMARY JUDGMENT

In accordance with the Magistrate's Report and Recommendation, the court reserves ruling on the Secretary's motion for summary judgment as to plaintiff's individual claim. At the hearing on the question of relief to be granted on the class claim, the parties will address the impact of such relief on plaintiff's individual claim.

IT IS NOW, THEREFORE, ORDERED as follows:

1. The Magistrate's Report and Recommendation of July 11, 1985 is adopted by the court.

2. Plaintiff's motion for partial summary judgment is GRANTED.

3. On November 8, 1985, at 11:00 a.m., the court will conduct a hearing on the question of relief to be granted on the class claim.

The Clerk of the Court is directed to forward copies of this Order to counsel of record.

### ORDER GRANTING RELIEF

THIS COURT having entered an Order Granting Plaintiff's Motion for Partial Summary Judgment in the above-entitled action on October 28, 1985, having heard from counsel for the plaintiff and defendant, and having considered the issue of appropriate relief in connection with that Order, now, therefore,

IT IS HEREBY ORDERED that relief be granted as follows:

1. The Secretary of Health and Human Services (the "Secretary") shall grant the relief specified in paragraph 2 to all claimants who:

—applied for disability insurance benefits under Titles II and/or XVI of the Social Security act or were previously found entitled to receive such benefits;

—received initial and/or reconsideration determinations denying their applications or terminating their disability benefits;

—received between August 1, 1981 and June 30, 1984, decisions from Administrative Law Judges at hearing offices in Washington who were targeted for review under the Bellmon Review Program based on allowance rates, which decisions revised those previous denials or terminations (hereinafter called "favorable ALJ decision"); and

—received Appeals Council decisions vacating and revising or remanding those favorable ALJ decisions by own-motion review initiated between October 1, 1981 and June 30, 1984. The initials and social security numbers of these claimants are attached as an Addendum to this Order and made a part thereof.

2. The relief that shall be granted by the Secretary to each such person referred to in paragraph 1 above is the reinstate-

---

19. Even if adoption of the Bellmon Review Program did not require notice and comment procedures, the program would still be void because the program was never published in the Federal Register pursuant to 5 U.S.C. § 552(a)(1) (1982). *See Anderson v. Butz,* 550 F.2d 459 (9th Cir.1977). The Secretary asserts that the program was an interpretive rule. If so, then publication in the Federal Register was required under 5 U.S.C. § 552(a)(1)(D) because the program is an interpretation of general applicability. In accordance with Subsections II–B–1 and II–B–2 of this Order, the court finds that the program is not a mere "clarification or explanation" and has "significant impact" on certain disability claimants. *See Anderson,* 550 F.2d at 463. The Secretary also asserts that the Bellmon Program was a procedural rule. If so, then clearly publication in the Federal Register was required under 5 U.S.C. § 552(a)(1)(C).

ment of his or her favorable ALJ decision effective the date of such decision.

3. As part of such relief, each person referred to in paragraph 1 above shall be entitled to and paid all benefits under Titles II and/or XVI to which he or she was entitled under the favorable ALJ decision, including benefits for times prior to the date of the favorable ALJ decision, if called for by such decision.

4. The Secretary is ordered forthwith to advise its employees and agents of the above, to compute and pay within 180 days all benefits due persons referred to in paragraph 1 above based upon the favorable ALJ decision and to disregard any or all decisions taken by the Appeals Council reversing or remanding such favorable ALJ decisions.

5. The Secretary shall make the following efforts to notify the claimants referred to in paragraph 1 above:

A. Mailing a letter by regular first-class mail to each claimant's last known address, which letter shall be approved by counsel for plaintiff, and shall advise such claimants (in language understandable to persons of limited education) of the terms of this Order and shall give them the telephone number, both of plaintiff's counsel and of an employee(s) of the Secretary, who can provide information and advice concerning how to obtain benefits due them.

B. Advising the State of Washington, including the Washington Department of Social and Health Services, of the terms of this Order seeking their cooperation in locating these persons. The Secretary shall pay the reasonable expenses, not to exceed $10,000, incurred by the State in locating these persons.

C. After the Secretary has attempted to locate class members through the means specified in paragraphs 5A and 5B, she shall place newspaper and other media announcements in a further effort to locate class members if more than 5 class members who are entitled to relief have not been located within 120 days of the entry of this order. The number and content of the announcements are to be agreed upon by the parties; however, if the parties cannot agree, this matter shall be decided by the court.

6. Plaintiffs may move for costs including attorneys fees within thirty (30) days of the entry of this Order.

## REPORT AND RECOMMENDATION

### July 11, 1985

PHILIP K. SWEIGERT, United States Magistrate.

## INTRODUCTION AND SUMMARY CONCLUSION

This matter comes on for consideration of plaintiff's class action challenging the defendant Secretary's implementation of the Bellmon Amendment. Plaintiff has moved for partial summary judgment on the class claim that the Secretary violated the requirements of the Administrative Procedure Act (APA) when she instituted the Bellmon Review Program. The Secretary has moved for summary judgment on W.C.'s individual claim for disability benefits. After careful review of the entire record, as well as the memoranda of the parties, I conclude that the Secretary violated the APA by failing to publish the Bellmon Review Program in the Federal Register and by not subjecting that program to the notice and comment requirements of 5 U.S.C. § 553(b), (c) (1982). Accordingly, I recommend that plaintiff's motion for partial summary judgment be granted. The Court should further reserve ruling on defendant's motion for summary judgment as to W.C.'s individual claim because the form of relief on the class claim may affect that result.

## DISCUSSION

Plaintiff commenced the instant action to challenge the Bellmon Review Program, instituted by the Secretary to implement the 1980 Bellmon Amendment to the Social Se-

curity Act.[1] Plaintiff's May 3, 1984 motion for partial summary judgment alternatively sought a preliminary injunction. However, that issue is moot because the Secretary has discontinued targeting high allowance ALJs under the Bellmon Program. Plaintiff also seeks a reversal of the Secretary's decision terminating his disability benefits.

On January 25, 1984, the Court certified a class with plaintiff as the representative of the class. The class is comprised of:

"All claimants within the State of Washington for Title II Social Security disability benefits or Title XVI Supplemental Social Security Income benefits who have received (or who receive during the pending of this litigation) decisions from ALJs reversing initial denials or terminations of disability and whose cases are then reviewed by the Appeals Council on its own motion pursuant to the Bellmon Amendment."

Plaintiff argues that the Secretary's implementation of the Bellmon Review Program, under which the Secretary targeted ALJs with high allowance rates for own motion review,[2] constituted a substantive rule required to be published in the Federal Register and subjected to the notice and comment provisions of the APA. See 5 U.S.C. § 553(b), (c). Alternatively, plaintiff maintains that even if the Bellmon Program was merely an interpretative rule or statement of general policy rather than a substantive rule, it was nevertheless required to be published under the Freedom of Information Act. 5 U.S.C. § 552(a)(1)(D).

Defendant argues that the Secretary's regulations implementing the Bellmon Amendment were exempt from publication because they were interpretative or procedural rules implementing the Secretary's preexisting own motion review authority.

See 5 U.S.C. § 553(b)(A). The Secretary has further claimed that the Court lacks jurisdiction over the class because plaintiff failed to show that all class members exhausted their administrative remedies and sought judicial review within sixty days of the Secretary's final decision.

## I. JURISDICTION.

Before reaching the merits of this case, it is necessary to address several jurisdictional issues which arose subsequent to the parties' motions for summary judgment. Following a hearing on December 7, 1984, plaintiff and defendant submitted supplemental briefs on these issues.

### (A) *1984 Disability Reform Act.*

Initially, the Court must determine whether the passage of the Disability Reform Act of 1984, P.L. 98–460, 98 Stat. 1794 *et seq.*, requires a remand of plaintiff's case to the Secretary for further proceedings. I conclude it does not. Section 2 of the Act provides a new medical improvement standard of review for determining Social Security disability benefits. The Secretary may terminate benefits by showing that an individual's physical or mental impairment "has ceased, does not exist, or is not disabling," so that "the individual is now able to engage in substantial gainful activity." *Id.* § 2(a). Such a finding may only be made if there is substantial evidence which demonstrates medical improvement in the individual's impairments so that the individual is now able to engage in substantial gainful activity.[3] *Id.* Moreover, this determination is to be made solely:

"... on the basis of the weight of the evidence and on a neutral basis with regard to the individual's condition, with-

1. Pub.L. No. 96–265, § 304(g) (1980), 94 Stat. 441, 456. See 42 U.S.C. § 421 (1982).

2. The allowance rate is that percentage of cases for which an ALJ grants or allows Social Security benefits.

3. In addition, an individual's benefits may be terminated where there is substantial evidence that: (1) the claimant has benefited from ad-

vances in medical or vocational therapy or technology and is able to engage in substantial gainful activity; (2) the claimant's impairment is no longer disabling based on new or improved diagnostic techniques or evaluations; or, (3) the Secretary's prior determination of disability is shown to be in error. Social Security Benefits Reform Act of 1984, *supra* at § 2(a)(1)–(4).

out any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled."
*Id.*

. The Secretary contends that § 2(d)(2) of the Act requires remand of W.C.'s case because it involves a termination of benefits. However, only W.C.'s individual claim involves a termination of benefits relating to medical improvement. The 1984 amendments do not otherwise affect plaintiff's class action claim challenging Bellmon Review. The claims of the rest of the certified class members are not related to termination of benefits or the medical improvement standard, and are not subject to remand.[4]

A number of courts have recently held that the Act's remand requirement is mandatory for all cases relating to medical improvement. See *Soper v. Heckler,* 754 F.2d 222 (7th Cir.1985); *Nowells v. Heckler,* 749 F.2d 1570 (11th Cir.1985); *Parker v. Heckler,* 750 F.2d 1474 (11th Cir.1985); *Harmon v. Secretary of Health and Human Services,* 749 F.2d 357 (6th Cir.1984); *Steele v. Heckler,* 748 F.2d 492 (8th Cir. 1984); *Jackson v. Heckler,* 745 F.2d 1326 (10th Cir.1984). However, in cases where the Secretary's prior decision included a determination of whether there has been a medical improvement, other courts have declined to remand the case to the Secretary. See *Sebion v. Heckler,* 757 F.2d 960 (8th Cir.1985) (remand not necessary in view of the fact that the ALJ adequately considered all evidence that is required under the new Act); *Colella v. Heckler,* 604 F.Supp. 593 (D.C.Pa.1985) (refusal to remand upon Rule 60(b) motion for reconsideration where Secretary's termination of benefits included a consideration of whether claimant's condition had improved medi-

cally); *Claassen v. Heckler,* 600 F.Supp. 1507 (D.C.Kan.1985) (no useful purpose served by remanding case under new law where that standard is more beneficial to plaintiff than previous standard already applied).

W.C.'s individual case has previously been remanded to the Secretary pursuant to the medical improvement standard of the amended preliminary injunction in *Morrison, et. al. v. Heckler,* 582 F.Supp. 321 (W.D.Wash.1983). On March 18, 1984, after reconsidering plaintiff's claim in light of the *Morrison* injunction, the Appeals Council upheld its previous decision (TR 4). The wording of the new Act's provisions regarding the standard of review in medical improvement cases is almost identical to the standard in *Patti v. Schweiker,* 669 F.2d 582 (9th Cir.1982), which the Secretary was obliged to follow pursuant to the *Morrison* injunction. The only noticeable difference is that under the new Act, there is no longer any presumption of disability where benefits have been previously awarded. See § 2(a). I conclude that because the Secretary has already determined under the more liberal standard in *Patti* that plaintiff W.C. is no longer entitled to any benefits, a remand under the new Act would undoubtably lead to the same conclusion and would serve no useful purpose. Cf. *Claassen v. Heckler, supra.*

A careful reading of the new Act provides yet another basis for not remanding plaintiff W.C.'s individual claim. Although the Act plainly requires a Court to remand "actions relating to medical improvement," the definition of an action "relating to medical improvement" excludes cases in which the Secretary terminated benefits while considering whether the claimant's condition had improved medically. § 2(d)(6).[5] In W.C.'s case, the Secretary

---

4. The Court recognizes the possibility that some class members' cases may have involved termination of benefits. However, these class members are not challenging the termination of their benefits on the ground that a medical improvement has not been shown, and the new Act does not apply because this is not an action relating to medical improvement.

5. The Act defines "action relating to medical improvement" as: "an action raising the issue of whether an individual who has had his entitlement to benefits ... based on disability terminated (or period of disability ended) should not have had such entitlement terminated ... *without consideration of whether there has been medical improvement in the condition of such*

has already considered whether there has been a medical improvement in his condition. Therefore, the Act, by its own terms, precludes an additional remand of his case. See *Colella v. Heckler, supra* at 595.

(B) *Mootness.*

Defendant argues that this case is now moot because the Secretary has discontinued the Bellmon Review Program's targeting of individual ALJs.

However, despite the discontinuation of the individual ALJ portion of the Bellmon Review Program, the Secretary has indicated in a related action that she has advised the ALJ corps of the possibility that Bellmon Review could be resumed. *Association of Administrative Law Judges v. Heckler,* 594 F.Supp. 1132, 1141 (D.D.C. 1984) (hereinafter cited as *ALJs v. Heckler* ). For this reason, I conclude that there remains a live controversy between the parties, at least insofar as plaintiffs seek retrospective relief for the denial of benefits pursuant to the Appeals Council taking own motion review under the Bellmon Program. See *Murphy v. Hunt,* 455 U.S. 478, 480, 102 S.Ct. 1181, 1182, 71 L.Ed.2d 353 (1982).

(C) *Exhaustion of Administrative Remedies.*

The Court's Order certifying the instant class action rejected defendant's argument that there was no jurisdiction over members of the class who did not exhaust their administrative remedies or appeal their cases within sixty days pursuant to 42 U.S.C. § 405(g). Defendant has now reasserted this argument, relying upon several recent court decisions.

Section 405(g) of the Social Security Act includes two requirements: (1) an individual must present a claim for benefits to the Secretary and (2) they must exhaust the administrative remedies established by the Secretary. The first requirement is jurisdictional and may not be waived; the sec-

ond requirement may be waived by either the Secretary or the courts. *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 2021, 80 L.Ed.2d 622 (1984); *Mathews v. Eldridge,* 424 U.S. 319, 328, 96 S.Ct. 893, 899, 47 L.Ed.2d 18 (1975).

Defendant's argument that class members have failed to exhaust their administrative remedies is misplaced. Each class member has submitted a claim for disability benefits to the Secretary. By virtue of the Order certifying the class, all class members have had their cases reviewed by the Appeals Council pursuant to the Bellmon Review Program. It is therefore not necessary to address defendant's argument that the Court should not waive the requirement of exhaustion because there has been a final decision rendered in the case of each class member. Nevertheless, the Court must decide whether each class member must have sought judicial review of the Secretary's final decision within sixty days pursuant to § 405(g).

Under the Social Security Act, claimants must seek judicial review of a final decision "within sixty days after the mailing ... of notice of such decision or within such further time as the Secretary may allow." 42 U.S.C. § 405(g). Defendant argues that the sixty-day provision is jurisdictional; whereas plaintiff claims that it is merely a statute of limitations subject to waiver. The Supreme Court has not definitively decided this question, although the Court has previously construed the sixty-day requirement as a statute of limitations waivable by the parties. See *Mathews v. Eldridge,* 424 U.S. 319, 328 n. 9, 96 S.Ct. 893, 899 n. 9, 47 L.Ed.2d 18 (1976); *Weinberger v. Salfi,* 422 U.S. 749, 763–64, 95 S.Ct. 2457, 2465–66, 45 L.Ed.2d 522 (1975).

I conclude that neither *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), nor the stay entered by Justice Rehnquist in *Heckler v. Lopez,* 463 U.S. 1328, 104 S.Ct. 10, 77 L.Ed.2d 1431 (1983)

---

*individual* ... since the time of a prior determination that the individual was under a disabili-

ty." § 2(d)(6) (emphasis added).

(Rehnquist, Circuit Justice), *motion to vacate stay denied*, 464 U.S. 879, 104 S.Ct. 221, 78 L.Ed.2d 217 (1983), *partial stay pending cert. granted*, 466 U.S. 955, 104 S.Ct. 2164, 80 L.Ed.2d 548 (1984), *vacated and remanded*, —— U.S. ——, 105 S.Ct. 583–84, 83 L.Ed.2d 694 (1984), require a different result. Although Justice Steven's partial dissent with respect to the denial of the motion to vacate the stay in *Lopez, supra*, 104 S.Ct. at 221, concluded that the sixty-day requirement would bar the claims of those class members who did not seek judicial review more than sixty days prior to the date the class action was filed, Justices Brennan and Marshall viewed the sixty-day requirement as waivable. *Id.* 104 S.Ct. at 225, 226. Moreover, in a separate opinion in *Heckler v. Ringer, supra*, 104 S.Ct. at 2028, 2033–36, Justice Stevens incorporated both the *Salfi* and *Eldridge* statements to the effect that § 405(g) contains a statute of limitations waivable by the parties. See *City of New York v. Heckler*, 742 F. 2d 729, 738 (2d Cir.1984), *rehearing denied*, 755 F.2d 31 (1985).

In the absence of an authoritative ruling by the Supreme Court, I conclude that the sixty-day requirement is a waivable statute of limitations. *Lopez v. Heckler*, 725 F.2d 1489, 1508 (9th Cir.), *vacated and remanded*, —— U.S. ——, 105 S.Ct. 583, 83 L.Ed.2d 694 (1984).[6] This conclusion is further supported by recent rulings by the Second and Third Circuits. See *City of New York, supra*, at 742 F.2d 738. *Mental Health Ass'n of Minnesota v. Heckler*, 720 F.2d 965, 973 n. 19 (8th Cir.1983); *Johnson v. Heckler*, 604 F.Supp. 1070, 1073–74 (N.D. Ill.1985); *State of New York v. Heckler*, 105 F.R.D. 118, 123 (S.D.N.Y.1985).

Furthermore, I conclude that the Secretary waived the statute of limitations defense. Although the Secretary's answer and memorandum in opposition to plaintiff's complaint and motion for class certification contain references to the requirements of 42 U.S.C. § 405(g), defendant did not sufficiently raise the statute of limitations defense. Accordingly, the requirement was waived by the Secretary. *Weinberger v. Salfi, supra*, 422 U.S. at 763–64, 95 S.Ct. at 2665–66; *Mathews v. Eldridge, supra*, 424 U.S. at 328 n. 9, 96 S.Ct. at 899 n. 9; *Lopez v. Heckler, supra*, 725 F.2d at 1505; *City of New York, supra*, 742 F.2d at 738. Even if it could be said that the Secretary sufficiently raised the sixty-day limitation defense, that requirement would not bar the claims of any class members because the sixty-day period was effectively tolled during the time that the Secretary's policy of targeting individual ALJs remained operative but undisclosed.

The sixty-day limitation for filing individual actions was tolled on the date this action was commenced by W.C., the named class representative. This action would further include those class members who received a final decision from the Secretary on or before sixty days prior to June 24, 1983, the date the class action was commenced. Despite the fact that all other unnamed plaintiffs who did not seek judicial review of final decisions made prior to the cut-off date of April 25, 1983, would otherwise be barred by a timely assertion of the statute of limitations defense, because the Secretary concealed and refused to publish (for notice and comment) the Bellmon Review Program, the sixty-day requirement was effectively tolled. All of the class members who had their cases reviewed under the Bellmon Review Program were entitled to believe that the Secretary's final decision was legally valid and not a product of an ill-fated program targeting individual ALJs on the basis of their allowance rates.

The sixty-day limitation is subject to equitable tolling on this basis. See *Lopez v. Heckler, supra*, 725 F.2d at 1505–07; *Borzeka v. Heckler*, 739 F.2d 444, 448 n. 3

---

**6.** Although *Lopez* was vacated and remanded by the Supreme Court, that ruling did not address the sixty-day limitation, and upon remand, the class certification initially made by the district court was not modified. The Ninth Circuit subsequently upheld the broad class originally certified in *Lopez*, which included claims of class members who did not seek judicial review within sixty-days under § 405(g). *Lopez v. Heckler*, 753 F.2d 1464 (9th Cir.1985).

(9th Cir.1984). Concealment of the Bellmon Review Program was sufficient to toll the sixty-day limitation requirement for all class members in this action. As the Court in *City of New York, supra,* held:

"Where the Government's secretive conduct prevents plaintiffs from knowing of a violation of rights, statutes of limitations have been tolled until such time as plaintiffs had a reasonable opportunity to learn the facts concerning the cause of action. See *Lopez v. Heckler, supra,* 725 F.2d [1489] 1505–07 (disability claim); *Barett v. United States,* 689 F.2d 324, 327–30 (2d Cir.1982) (claim under Federal Tort Claims Act), *cert. denied,* [462] U.S. [1131], 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983); *Chiappa v. Califano,* 480 F.Supp. 856 (S.D.N.Y.1979) (disability claim)."

*Id.* 742 F.2d at 738; *State of New York v. Heckler, supra,* 105 F.R.D. at 123–24.

## II. MERITS OF CLASS ACTION.

### A. *Bellmon Review Program.*

As part of the 1980 amendments to the Social Security Act, Congress enacted the Bellmon Amendment requiring the Social Security Administration to institute a program of ongoing review of ALJ disability claim decisions. Section 304(g) of the Bellmon Amendment provided that:

"The Secretary of Health and Human Services shall implement a program of reviewing, on his own motion, decisions rendered by administrative law judges as a result of hearings under § 221(d) of the Social Security Act, and shall report to the Congress by January 1, 1982, on his progress."

Social Security Disability Amendments of 1980, Pub.L. No. 96–265, § 304(g), 94 Stat. 441, 456.

The Bellmon Amendment was enacted out of congressional concerns about the increasing number of disability decisions being appealed to ALJs, the high percentage of allowance rates by the ALJs, the accuracy of those decisions, and because only ALJ decisions denying benefits were generally subject to review. H.R.Rep. No. 944, 96th Cong., 2d Sess. 57 (1980), *reprinted in* [1980] U.S.Code Cong. & Ad.News 1392, 1405; S.Rep. No. 408, 96th Cong., 2d Sess. 53 (1980), *reprinted in* [1980] U.S. Code Cong. & Ad.News 1277, 1331. See *ALJs v. Heckler, supra,* 594 F.Supp. at 1134.

Prior to implementing the Bellmon Amendment, the Secretary undertook a random sample review of 3,600 ALJ decisions, including denials as well as allowances. The study indicated that "there was a higher probability of error in favorable decisions of administrative law judges with high overall allowance rates." The Bellmon Review Program was instituted in October, 1981, as a means to improve decisional quality and accuracy. Initially, 7½% of the allowance decisions of ALJs with allowance rates of 70 percent or higher were selected for review.[7] In addition, hearing offices with allowance rates of 74% or higher were also reviewed. Approximately 13%, or 106 ALJs, were placed on Bellmon Review in 1981 because of their high allowance rates. *ALJs v. Heckler, supra,* 594 F.Supp. at 1134.

In April, 1982, the Bellmon Review Program was enlarged to include 15% of ALJ disability allowance decisions. In addition to targeting individual ALJs on the basis of their allowance rates, the case selection criteria was expanded to include a national random sample of ALJ allowance decisions, referrals from the Social Security Administration's Office of Disability Operations, and the decisions of all newly hired ALJs. In December, 1982, the Secretary stopped using allowance rates to target ALJs for Bellmon Review and reviewed individual ALJ's decisions solely on the basis of their own motion rates under the national ran-

---

**7.** Targeted ALJs were divided into four groups based upon their own motion review rate, e.g., the frequency with which the Appeals Council takes action to correct an ALJ's decision. The ALJs were either subject to 100% review, 75% review, 50% review, or 25% review based on their "decisional accuracy" as determined by their own motion review rates. See *ALJs v. Heckler, supra* at 1134.

dom sample. After a brief period of including in Bellmon Review unappealed decisions denying benefits by ALJs with high "grant-review" rates (the rate at which the Appeals Council grants claimants' requests for review of denial decisions), the Secretary eliminated entirely the individual ALJ portion of the Bellmon Review Program. Notice of Filing June 22, 1984, Memorandum to all ALJs, June 21, 1984. See *ALJs v. Heckler, supra*, 594 F.Supp. at 1135.

### B. *APA Claim.*

Plaintiff contends that targeting individual ALJs under the Bellmon Review Program without publication or opportunity for notice and comment violated the APA. 5 U.S.C. § 553(b), (c) (1982). Under the APA, an agency must publish notice of a proposed substantive rule in the Federal Register to allow an opportunity for interested members of the public to comment. 5 U.S.C. § 553(b), (c); *Powderly v. Schweiker*, 704 F.2d 1092, 1098 (9th Cir. 1983).

In January, 1982, the Secretary issued Social Security Rule 82–13 (SSR 82–13), which had been previously published as a "Program Policy Statement." (See attachment A.) SSR 82–13's stated purpose was:

> "To announce SSA's institution of a program for ongoing review of administrative law judge decisions ... and to state the policy on Appeals Council review of hearing decisions upon the Appeals Council's own motion under this program."

*Id.* SSR 82–13 further provided that the program was necessary because "in the past several years the Council has not conducted an ongoing, pre-effectuation review of favorable administrative law judge decisions for the purpose of identifying the need for, and, where necessary, taking corrective action." *Id.* The Secretary announced that in accordance with the "statu-

tory mandate" of the Bellmon Amendment, the Administration would begin to:

> "... conduct a comprehensive, ongoing program under which a prescribed percentage of administrative law judge decisions involving the issue of disability, particularly those allowing previously denied claims for disability benefits, will be evaluated prior to their effectuation, even though there is no request for review. When appropriate, the decision will be referred for possible review of the Appeals Council."

*Id.*

SSR 82–13 was issued after the Secretary implemented the first portion of the Bellmon Review Program in October, 1981. The program was not even communicated to the ALJ corps until September, 1982. In a memorandum to the ALJ corps from Associate Commissioner Louis B. Hays on September 24, 1982 ("Hays Memorandum"), the Secretary first announced the specific categories of cases which would automatically be considered for review. (See Attachment B.) Neither the Hays Memorandum nor SSR 82–13 were published in the Federal Register or subjected to the APA's notice and comment provisions.

Plaintiff contends that the Bellmon Review Program was a new substantive rule subject to the requirements of the APA. Defendant argues that the challenged rules [8] were not required to be published under the APA because they were "only interpretative rules" or "rules of procedure." Although SSR 82–13 did not establish a new category or ground for review of ALJ decisions, it announced the implementation of a program for reviewing cases upon the Secretary's own motion. The Hays Memorandum later set forth the specific criteria for targeting ALJs. For purposes of review under the APA, these documents must be characterized as adminis-

---

**8.** The Bellmon Review Program was not described in any one particular "rule" or document. In fact, there is no single document that plaintiff contends should have been published. However, the 1982 Hays Memorandum and SSR 82–13, which are attached to this Report and Recommendation, best describe the Bellmon Review Program and are the focus of plaintiff's motion for summary judgment.

trative rules.[9] The APA "broadly defines an agency rule to include nearly every statement an agency can make." *Batterton v. Marshall*, 648 F.2d 694, 700 (D.C.Cir. 1980).

### 1. *Interpretative Rule Exception.*

Except when required by statute, an administrative agency is exempted from the notice and comment requirements of the APA if the rule in question is determined to be an interpretative rule or a general statement of policy or rule of agency organization, procedure or practice. 5 U.S.C. § 553(b)(A). Substantive or legislative rules and interpretative rules are not always clearly distinguishable. The Court's inquiry must focus primarily on the rules themselves. While the Court may not impose additional requirements beyond those of the APA, it is not bound by the Secretary's classification of the rule in question because "the substance, not the label is determinative." *United States Department of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1149 (5th Cir.1984); *Anderson v. Butz*, 550 F.2d 459, 463 (9th Cir.1977). In addition, the exceptions to the notice and comment provisions of § 553 are to be "narrowly construed and reluctantly countenanced." *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir.1984) (citations omitted). See also *National Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (9th Cir.1982), *cert. denied*, 459 U.S. 1205, 103 S.Ct. 1193, 75 L.Ed.2d 438 (1983).

The Bellmon Review Program for the first time instituted and created a program for selecting cases for own motion review. Prior to its implementation, the Secretary had the authority to reopen and revise any decision for certain specified reasons. See 20 C.F.R. §§ 404.987–404.989 (1984). In 1976, the Secretary promulgated new regulations governing own motion review of an ALJ's decision. The regulations provide that the Appeals Council may decide on its own motion to review an ALJ's decision within sixty days if one of four grounds is determined to be present. 20 C.F.R. §§ 404.969–404.970 (1984). Unless one of these four grounds is present, the Appeals Council has no authority to review the ALJ's decision, either on its own motion or at the request of a claimant. See *Newsome v. Secretary of Health and Human Services*, 753 F.2d 44, 46 (6th Cir.1984); *Parris v. Heckler*, 733 F.2d 324, 325 (4th Cir.1984).

One year after the Bellmon Program was instituted, 12,000 favorable ALJ decisions were considered for own motion review. 2,200 were actually reviewed in fiscal year 1982. During 1981, no favorable decisions were reviewed at all. The exercise of this authority was the direct result of the Bellmon Review Program. In 1982, the Secretary also considered approximately 64,000 denial decisions for review upon a claimant's request. However, the more extensive review of ALJ denials has no bearing on whether the Secretary's implementation of the Bellmon Review Program was a substantive rule. Indeed, the "rule" whereby claimants may request the Secretary to consider their case for review following an ALJ's denial was published and is codified at 20 C.F.R. § 404.967 and § 404.968.

Substantive rules are "those which effect a change in existing law or policy." *Powderly, supra*, 704 F.2d at 1098. Such rules affect individual rights and obligations. *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). On the other hand, "[i]nterpretative rules are those which merely clarify or explain existing law or regulations." *Powderly, supra*, 704 F.2d at 1098. Such rules simply advise the public of the agency's "construction of the

---

**9.** The APA defines a rule as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances thereof or of valuations, costs or accounting or practices bearing on any of the foregoing." 5 U.S.C. § 551(4) (1982).

statutes or regulations it administers." *American Medical Ass'n v. Heckler,* 606 F.Supp. 1422, 1439 (S.D.Ind.1985). The "proper test" to distinguish legislative from interpretative rules, was stated in *Gibson Wine Co. v. Snyder,* 194 F.2d 329 (D.C.Cir.1952):

> "Administrative officials frequently announce their views as to the meaning of statutes or regulations. Generally speaking, it seems to be established that 'regulations,' *'substantive rules,' or 'legislative rules' are those which create law, usually implementary to an existing law;* where interpretative rules are statements as to what the administrative officer thinks the statute or regulation means."

*Id.* at 331 (emphasis added). See also *Cabais v. Egger,* 690 F.2d 234, 238 (D.C.Cir. 1982); *Alcaraz, supra,* 746 F.2d at 613.

The fundamental distinction between legislative and interpretative rules is that:

> "A legislative rule is the product of an exercise in delegated legislative power to make law through rules. An interpretative rule is any rule an agency issues without exercising delegated legislative power to make law through rules."

2 K. Davis, Administrative Law Treatise, § 7:8 at 36 (2d ed. 1979 and 1982 supplement). See *Stoddard Lumber Co., Inc. v. Marshall,* 627 F.2d 984, 987 (9th Cir.1980). In addition, when an agency exercises its delegated power under a statute, its rules or regulations "clearly may be legislative even when they interpret the statute." 2 K. Davis, *supra,* § 7:11 at 57.

The Bellmon Amendment expressly delegated to the Secretary the authority to prescribe a program to implement own motion review of ALJ decisions. In SSR 82–13, the Secretary announced that as a result of the Bellmon Amendment, the agency "is implementing a *new review process,* ..." (emphasis added). Contrary to the Secretary's argument, the Bellmon Amendment did not require or mandate a program of targeting all high allowance ALJs for own motion review. By directing the Secretary to "implement a program" of own motion review of ALJ decisions, the Bellmon Amendment *delegated* that rulemaking power to the Secretary. In exercising that responsibility, the Bellmon Review Program had a "legislative effect." *Batterton v. Francis,* 432 U.S. 416, 425 & n. 9, 97 S.Ct. 2399, 2405 & n. 9, 53 L.Ed.2d 448 (1977); *See American Medical Ass'n, supra,* 606 F.Supp. at 1439.

The Bellmon Review Program represented the creation of a new law based on the delegation of such authority pursuant to the Bellmon Amendment. Indeed, in SSR 82–13, the Secretary even cited the Bellmon Amendment as authority for the new program. The Bellmon Review Program clearly did more than interpret the Bellmon Amendment. Although own motion review authority previously existed, the Secretary for the first time created a program ("rule") to implement that authority by targeting ALJ allowance decisions for own motion review. "An agency promulgates a legislative rule when it 'intends to create new law, rights or duties.'" *American Medical Ass'n, supra,* 606 F.Supp. at 1439, quoting *General Motors Corp. v. Ruckelshaus,* 742 F.2d 1561, 1565 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2153, 85 L.Ed.2d 509 (1985). Examined in this manner, there can be no doubt that the Secretary's institution of the Bellmon Program, pursuant to a congressional amendment specifically delegating the Secretary such authority, was a substantial rule that created new law accompanied by specific rights and duties.

I conclude that the institution of the Bellmon Review Program was a substantive rule subject to the APA's notice and comment provisions. Insofar as the second part of SSR 82–13 clarified the Secretary's policy and existing regulations as to when the Secretary would review a case pursuant to the four grounds prescribed at 20 C.F.R. § 404.970, it was an interpretative rule. However, the institution of the Bellmon Review Program itself, as outlined in the first part of SSR 82–13 and communicated in the Hays Memorandum, was a substantive rule defining the procedures

and legal standards for subjecting an ALJ's decision to own motion review. Although the cases considered for review pursuant to the Bellmon Program were not automatically reviewed (because one of the four grounds must be determined to be present), this was a new program that went far beyond the Secretary's previous policy of not reviewing any favorable ALJ decisions.[10]

### 2. Procedural Rule Exception.

In addition to interpretative rules, the APA also exempts rules of agency procedure. 5 U.S.C. § 553(b)(A). The Secretary contends that the Bellmon Program was a procedural rule because it "merely indicate[d] how the cases will be initially screened" for review under 20 C.F.R. § 404.970. This characterization of the Bellmon Review Program is misplaced. Even if the Bellmon Program could be characterized as an initial screening program, it was a substantive rule under the APA because it set forth new legal standards and criteria whereby high allowance decisions would be "screened." More important, the exception does not apply "to those procedural rules that depart from existing practice and have a substantial impact on those regulated," or "where the agency action touches on substantive rights and interests." *National Ass'n of Home Health Agencies, supra,* 690 F.2d at 949, quoting *Brown Express, Inc. v. United States,* 607 F.2d 695, 702 (5th Cir.1979), and *Batterton v. Marshall, supra,* 648 F.2d at 708. Although the substantial impact of a rule is no longer an independent

basis for determining whether a rule is legislative, *Rivera v. Becerra,* 714 F.2d 887, 891 (9th Cir.1983), it remains relevant in construing the intent of the agency in issuing the rule and may be considered as one of the criteria for determining whether a rule is exempt from the APA. *Cabais v. Egger, supra,* 690 F.2d at 237; *Levesque v. Block,* 723 F.2d 175, 182 (1st Cir.1983).

The substantive rights of individual claimants were severely affected by the Bellmon Review Program. The program created a new law which significantly impacted individual claimants by compromising the decisional independence of ALJs. First, the Bellmon Review Program "was not consistent with the language of the Bellmon Amendment nor its sparce legislative history."[11] *ALJs v. Heckler, supra,* 594 F.Supp. at 1141–42. Second, the Senate Subcommittee on Oversight of Government Management of the Committee on Governmental Affairs found that the Secretary was "pressuring its ALJs to reduce the rate at which they allow disabled persons to participate in or continue to participate in the Social Security disability program ...," and concluded that "[t]he SSA has therefore unjustifiably and unequitably focused its efforts on the ALJ allowance rates in such a way as to result in less impartial and fair hearings for some disability claimants...." Staff of Senate Comm. on Governmental Affairs, 98th Cong., 1st Sess. "The Role of the Administrative Law Judge in the Title II Social Security Disability Insurance Program 36 (Comm. Print 1983) ("Senate Comm. Print"). On the basis of these findings, the

---

**10.** Although 20 C.F.R. § 404.969 provided the necessary authority for the Secretary to consider on her own motion an ALJ's decision, this regulation was not the basis for the Bellmon Review Program. Theoretically, the Secretary could have begun to consider an allowance decision on her own motion without implementing the Bellmon Review Program. Nevertheless, by instituting the Bellmon Program, the Secretary was engaging in substantive rulemaking, which necessarily triggered the notice and comment provisions of the APA.

**11.** Neither directed SSA to focus on allowance decisions or target for review only ALJs with

high allowance rates. Although Senator Bellmon stated that SSA was to review the allowance decisions of those ALJs with high allowance rates, those remarks were not incorporated into the law. And while the Senate version of the Bellmon Amendment required such targeting, the later Conference Report did not. In fact, Associate Commissioner Louis Hays testified in *ALJs v. Heckler* that he interpreted the Bellmon Amendment and its legislative history to require targeting of high allowance ALJs even though he was cautioned against such an interpretation by the SSA's Office of General Counsel. See *ALJs v. Heckler, supra* at 1136, 1142.

Subcommittee recommended that "[a]ll Bellmon Review activity should be discontinued immediately." *Id.* at 37.

Further, in *ALJs v. Heckler, supra,* the Court held that the Secretary "retained an unjustifiable preoccupation with allowance rates, to the extent that ALJs could reasonably feel pressure to issue fewer allowance decisions in the name of accuracy." *Id.* 594 F.Supp. at 1142. The Court concluded that the Secretary's "unremitting focus on allowance rates in the individual portion of the Bellmon Review Program created an untenable atmosphere of tension and unfairness which ... could have tended to corrupt the ability of administrative law judges to exercise that independence in the vital cases they decide." *Id.* at 1143.

The findings of the Senate Subcommittee and the holding in *ALJs v. Heckler* demonstrate that the Bellmon Review Program was a substantive rule under the APA. In *ALJs v. Heckler,* the plaintiffs directly attacked the Bellmon Review Program itself, not the Bellmon Amendment or existing own motion review regulations which the Secretary now contends the Bellmon Program merely interpreted. If the Bellmon Review Program did not institute and create a new substantive rule, there of course would have been no basis for that lawsuit.[12] The Secretary's argument that the program was merely an interpretative or procedural rule is further undercut by the fact that since the Secretary first "interpreted" the Bellmon Amendment in 1981, the Bellmon Review Program has been changed at least four times (without publication or opportunity for notice and comment), and is now completely different from 1981 and 1982 when the Secretary targeted high allowance ALJs. Meanwhile, Congress has not amended the original language of the Bellmon Amendment, which the Secretary now boldly contends "mandated" targeting high allowance ALJs. Finally, although it would have been a simple task for the Secretary to publish the details of the Bellmon Review Program for notice and comment, the Secretary's refusal to do so may be viewed as an attempt to shield that unjustifiable and illegal program from public scrutiny. Indeed, it is not beyond speculation to conclude that comments to the Bellmon Review Program would not have been particularly favorable, or that such comments might have prevented the program's implementation.

## CONCLUSION

In sum, the Secretary's implementation of the Bellmon Review Program targeting high allowance ALJs for own motion review was a substantive or legislative-type rule which was subject to the notice and comment provisions of the APA. Because I conclude that the Secretary violated § 553 of the APA, it is not necessary to consider plaintiff's second claim that the Secretary violated the publication requirements of Freedom of Information Act. 5 U.S.C. § 552(a)(1)(D) (1982).[13]

Finally, in terms of the relief plaintiffs are due, it is well established that an administrative rule found to be in violation of the notice and comment requirements of the APA is void and ineffective. *Alaniz v. Office of Personnel Management,* 728 F.2d 1460, 1469 (Fed.Cir.1984); *Buschmann v. Schweiker,* 676 F.2d 352, 355–356 (9th Cir.

---

**12.** The Court is aware of yet another case challenging the Bellmon Review Program. In *Stieberger v. Heckler,* 615 F.Supp. 1315 (LBS) (S.D. N.Y.1985), a class action consisting of individual claimants, plaintiffs asserted that the implementation of the Bellmon Program deprived them of a fair and impartial hearing under the Social Security Act, the APA and the Fifth Amendment of the Constitution. On May 8, 1985, U.S. Magistrate Naomi Reice Buchwald issued a report and recommendation granting plaintiffs' request for a preliminary injunction to enjoin the Secretary from continued implementation of Bellmon Review (as well as the Secretary's non-acquiescence policy).

**13.** As a practical matter, the Court agrees with plaintiff in that even if the Bellmon Program was not a substantive rule, it was either a procedural rule or an interpretation or statement of general applicability required to be published in the Federal Register under the FOIA. 5 U.S.C. § 552(a)(1)(C), (D). See *Anderson v. Butz,* 550 F.2d 459, 463 (9th Cir.1977); *Herron v. Heckler, supra,* 576 F.Supp. at 233; *Aiken v. Obledo,* 442 F.Supp. 628, 654 (N.D.Cal.1977).

1982); *Anderson v. Butz, supra,* 550 F.2d at 462; *Western Oil and Gas Ass'n v. U.S. Environmental Protection Agency,* 633 F.2d 803, 812-13 (9th Cir.1980); *Hotch v. United States,* 212 F.2d 280 (9th Cir.1954); *Herron v. Heckler,* 576 F.Supp. 218, 232 (N.D.Cal.1983). Moreover, the Secretary cannot rest on the doctrine of harmless error to escape this conclusion. While that doctrine is applicable to review of agency actions,[14] "[t]he Secretary can rely on harmless error only 'when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of the decision reached.'" *Buschmann, supra,* 676 F.2d at 358, citing *Braniff Airways v. CAB,* 379 F.2d 453 (D.C.Cir.1967).

Where the agency's error is prejudicial to the plaintiffs, its failure to comply with the notice and comment requirements cannot be harmless. *County of Del Norte v. United States,* 732 F.2d 1462, 1467 (9th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985); *Buschmann, supra.* Here the Secretary's error plainly affected the procedure used to implement the Bellmon Amendment. Plaintiffs were denied notice and the opportunity to comment on a new policy which directly affected their claims for disability benefits. Because the implementation of the Bellmon Review Program violated the APA, it cannot be given any legal effect. The practical effect of this holding is that in all cases where the Appeals Council took own motion review of the decision of a targeted ALJ, the Appeals Council's decision is void and without judicial effect.

Accordingly, plaintiffs' motion for partial summary judgment should be granted. Since this relief may obviate plaintiff W.C.'s individual claim for disability benefits, the Court should reserve ruling on defendant's motion for summary judgment with respect to W.C.'s individual claim until the final form of judgment is entered. I also recommend that the Court set the mat-

ter down for further hearing as to the form of judgment and procedures for notice to the class.

A proposed form of Order is attached.

## ATTACHMENT A

**Part 1B**
**Rulings Based on Program Policy Statements**

SSR-82-12

### TITLE XVI: ALERTING TITLE II APPLICANTS TO POSSIBLE TITLE XVI ELIGIBILITY

**(SSR 80-16 (Published as PPS-48) (Rescinded)**

SSR 80-16 (C.E.1980, p. 96), which provided policy to ensure that title II (Social Security) applicants potentially entitled to supplemental security income (SSI, title XVI) are made aware of their rights to SSI, is rescinded without replacement. Procedures fully protecting the rights of those applicants are provided in current operating instructions.

---

**(Previously Published as PPS-62)**

SSR 82-13

### PROGRAM FOR ONGOING REVIEW OF HEARING DECISIONS PURSUANT TO SECTION 304(g) OF PUBLIC LAW (P.L.) 96-265 APPEALS COUNCIL'S REVIEW AUTHORITY

**PURPOSE:** To announce SSA's institution of a program for ongoing review of administrative law judge decisions in the Office of Hearings and Appeals and to state the policy on Appeals Council review of hearing decisions upon the Appeals Council's own motion under this program.

**CITATIONS (AUTHORITY):** Sections 205 and 1631(c) and (d), of the Social Security Act, as amended; section 304(g) of Public Law 96-265; Social Security Administration Regulations, title 20, Code of Federal

---

**14.** The APA provides that in judicial review of agency actions, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706.

See *Buschmann v. Schweiker, supra,* 676 F.2d at 358.

Regulations, sections 404.969, 416.1469, and 422.205; Statement of Organization, Functions and Delegations of Authority (45 FR 79168, November 28, 1980); and Decision of the Commissioner of Social Security dated July 20, 1981.

**PERTINENT HISTORY:** By delegation of authority from the Secretary of Health and Human Services, the Appeals Council of the Office of Hearings and Appeals, Social Security Administration, reviews decisions and dismissal actions of administrative law judges involving retirement, survivors, disability, health insurance, and supplemental security income on motion of appellants or on its own motion.

Section 304(g) of Public Law 96–265, enacted June 9, 1980, states that: "The Secretary ... shall implement a program of reviewing, on his own motion, decisions rendered by administrative law judges as a result of hearings under section 221(d) of the Social Security Act...."

As a result of this provision, SSA is instituting a new review process, as described in this Program Policy Statement. In implementing this process the Appeals Council will, where appropriate, exercise its preexisting, own motion review authority.

The statutory provision is the result of Congressional concern about what is considered a high overall percentage of claims for disability benefits allowed at the hearing level and the wide variance in allowance rates among individual administrative law judges. It also reflects Congressional intent that there should be a review program that incorporates the same adjudicative principles that bind the administrative law judges and provides for uniformity of decision making at all adjudicatory levels.

Although the Appeals Council of the Office of Hearings and Appeals (OHA) receives and acts upon requests for review submitted by claimants dissatisfied with hearing decisions and dismissals, in the past several years the Council has not conducted an ongoing, pre-effectuation review of favorable administrative law judge decisions for the purpose of identifying the need for, and, where necessary, taking corrective action. Consequently, in accordance with the statutory mandate, OHA will conduct a comprehensive, ongoing program under which a prescribed percentage of administrative law judge decisions involving the issue of disability, particularly those allowing previously denied claims for disability benefits, will be evaluated prior to their effectuation, even though there is no request for review. When appropriate, the decision will be referred for possible review by the Appeals Council.

"Review" has a specific meaning as it relates to the Appeals Council. To "review on its own motion," when "the Appeals Council reviews," or similar usage means that the Appeals Councils stays the effect of the hearing decision with the intent to issue a new decision or order an administrative law judge to issue a new decision. It is important to note that P.L. 96–265 requires only the establishment of a program for reviewing cases upon the Secretary's own motion; it does not require the Appeals Council to review any specific case unless it decides there is reason to do so. Once the Appeals Council decides to review a hearing decision on its own motion, it may affirm, reverse or modify the decision or remand the case to an administrative law judge for further proceedings.

The policies for own motion review under section 304(g), as well as the delegation of authority to the Appeals Council, are stated herein for public understanding in view of the institution of an ongoing program of evaluation of administrative law judge (ALJ) actions, particularly those which result in decisions favorable to the claimants.

**POLICY STATEMENT:** The Appeals Council is charged with insuring that the final actions of the agency are proper and in accordance with the law, regulations and binding agency policies. As herein pertinent, the regulations of the Social Security Administration with respect to Appeals Council review provide as follows:

Sections 404.969 and 416.1469

"Appeals Council initiates review. Anytime within 60 days after the date of a

hearing decision or dismissal, the Appeals Council itself may decide to review the action that was taken...."

The regulations provide the Appeals Council the discretionary authority to review any decision or dismissal action for any reason. This is not a newly acquired authority but has existed for many years.

The ongoing review in accordance with P.L. 96–265 will be implemented primarily on the basis of the categories set forth below. Upon full consideration of the entire record, the applicable law, regulations and binding policies, the Appeals Council will exercise its own motion authority if any one of the following is present. (Binding policies which are not published in the Federal Register are generally available as Social Security Rulings, but also may be available in some other form when they have been identified pursuant to 5 U.S.C. 552(a)(2) as statements of policy and interpretation which have been adopted as binding by the Commissioner of Social Security.)

The Appeals Council will review a hearing decision if there appears to be an abuse of discretion by the administrative law judge. Such abuse will be considered present where an action taken by the administrative law judge is erroneous and without any rational basis, such as where there has been an improper exercise, or a failure to exercise, administrative authority. Although this concept cannot be defined comprehensively, examples of abuses of discretion include: failure to have the claimant submit evidence necessary to support his/her claim; failure to conduct a full and fair hearing; and failure to allow postponement of a scheduled hearing despite physician documentation of the claimant's unavailability for health reasons. An abuse of discretion may also occur where there is a failure to follow procedures required by law.

The Appeals Council will review a hearing decision for error of law. Error of law exists where there has been misinterpretation or misapplication of, or failure to consider, pertinent provisions of law, regula-tions, and binding agency policies. Misinterpretation or misapplication occurs where the decision is contrary to statutory or regulatory provisions or agency policies or where the decision is based on an erroneous legal standard.

The Appeals Council will also review a hearing decision where it is not supported by substantial evidence. Substantial evidence may be defined as that amount of evidence which, while it may be less than a preponderance, nevertheless is sufficient to convince a reasonable mind of the validity of a position taken on an issue. Under the substantial evidence rule, the Appeals Council evaluates the hearing decision by looking to the record as a whole in order to determine if sufficient evidence exists to support the administrative law judge's action, and stated findings and conclusions. This requires that the decision be based on sufficient quantity and quality of evidence so that a reasonable mind might come to the same conclusion.

In addition, the Appeals Council will review a hearing decision where there is a broad policy or procedural issue that may affect the general public interest. Review for this reason will generally be limited to circumstances in which a decision raises or addresses a question which has potentially far-reaching applicability for a significant number of claims.

The Appeals Council will not ordinarily review a hearing decision where the end result would remain unchanged unless there is a compelling need to do so.

Nothing in this Program Policy Statement alters or affects the Appeals Council's authority to reopen a decision under the rules set forth in regulations sections 404.988 and 416.1488. Under these regulations, the Appeals Council may reopen for any reason any decision within 12 months of the date of the notice of the initial determination. After 12 months, the Appeals Council may reopen a decision for such reasons as specified in the regulations.

The procedures and instructions for staff which provide support to the Appeals Coun-

cil in performing its review functions are contained in staff manuals.

**EFFECTIVE DATE:** The ongoing program of comprehensive evaluation of administrative law judge actions within OHA commenced effective October 1, 1981.

**CROSS–REFERENCES:** Claims Manual sections 7166.4 and 13691.5.

———

ATTACHMENT B

EXHIBIT A

Date:     SEP 24 1982

From:     Associate Commissioner

Office of Hearings and Appeals

Subject:     Description of the Bellmon Own-Motion Review Program—INFORMATION

To:     All Administrative Law Judges

The purpose of this memorandum is to provide you with an overview of the Bellmon review as it is now functioning and the results of the review.

The ongoing review of hearing decisions under the Bellmon Amendment is intended to promote greater consistency and accuracy by identifying and correcting those decisions that do not comply with the applicable provisions of the law, regulations and Rulings. Under the Bellmon review program, the Appeals Council, on its own motion, formally reviews ALJ decisions that do not appear to be correct and, where the decision is incorrect, either reverses the ALJ's decision or remands the case to the ALJ for further proceedings. (For a more complete description of the procedures used by the Appeals Council, see Social Security Ruling 82–13 published in the January 1982 compilation of the Rulings.) This program results from Congressional concerns about the high overall percentage of cases allowed at the hearing level, the wide variance in allowance rates among individual ALJs, the fact that only ALJ decisions denying benefits were generally subject to further review, and the inconsistencies noted in decision-making at the different adjudicatory levels.

The initial phase of the pre-effectuation ongoing review program, which started October 1, 1981, was limited to approximately seven and one-half percent of all Title II and Title II/XVI concurrent disability allowance decisions issued by a group of hearing offices (HOs) and individual ALJs selected on the basis of allowance rules of 70 percent or higher, and 74 percent or higher, respectively. Allowance rates were used as the basis for selecting the initial review group, both because of Congressional intent and because studies had shown that decisions in this group would be the most likely to contain errors which would otherwise go uncorrected. Rather than reviewing all disability allowance decisions produced by these HOs/ALJs, a decision was made to review half of the group's allowance decisions in order to increase the total number of ALJs under review and thereby enhance the overall effectiveness of the review. The initial selection procedure was designed to yield a group of hearing decisions for review which were likely to be among the most error prone and thus to make the most efficient use of resources while correcting the greatest number of faulty hearing decisions.

On April 1, the Bellmon review was enlarged to include 15 percent of ALJ disability allowance decisions, and the case selection criteria for the Bellmon program were redesigned and expanded. Under this expansion, the group of ALJs selected on the basis of high allowance rates is just one of several components of the review. A national random sample of ALJ allowances, without regard to any ALJ's allowance rate, now accounts for 25 percent of the total reviewed cases. The expanded Bellmon review also includes cases identified and referred to the Appeals Council by the Office of Disability Operations (ODO). In addition, a review of decisions from new ALJs is included in the program. One other change has been to remove entire hearing offices from the review.

The following is a summary of the four aspects of the Bellmon review:

- Random Sample—A national random sample of allowance decisions accounts for 25 percent of the Bellmon cases. These cases are randomly selected and sent to OHA from ODO prior to effectuation. Data from this part of the Bellmon review is especially important as a baseline for comparison with information from the review of individual ALJs. It is also an important means of providing feedback on the quality of decisions to all ALJs and will aid in identifying areas where policy clarification or training is needed.

- New ALJs—The decisions from new ALJs are reviewed until it is determined that each ALJ's work is satisfactory. The review of new ALJs is useful in determining the effectiveness of the ALJ training program, and it enables us to take remedial action, if necessary, at the most opportune stage in an ALJ's development.

- ODO Protests—Disability examiners in ODO are reviewing a sample of ALJ allowances prior to effectuation as part of a pilot project. If a disability examiner believes there is a substantive disability issue in the case which does not comport with the law and regulations, the claim file is referred to OHA and made part of the Bellmon review. The Appeals Council follows standard procedures in deciding whether or not to take own motion.

- Individual ALJs—During the initial phase of the ongoing review, data were collected on own motion rates (the frequency that the Appeals Council takes action to correct an ALJ decision). Based on these data, ALJs are divided into four groups—those on 100 percent review, 75 percent review, 50 percent review and 25 percent review. Generally, as ALJs' own motion rates decline, their level of review also decreases. Continuing modifications are made in the group of ALJs under review and the level of review for individual ALJs. One hundred-six ALJs are included in this portion of the Bellmon review.

Although the allowance rate is the basis for selection of individual ALJs for that portion of the review, this factor receives no consideration in determining whether to remove ALJs from review. Decisional accuracy is the sole criterion, which we have defined as a five percent own motion rate for three consecutive months. In other words, an ALJ with an extremely high allowance rate could be removed from the Bellmon review if his or her decisions are correct.

Through September 1, we have reviewed 10,500 allowance decisions. The own motion rate for all of these cases is 12.1 percent. However, the rates vary significantly depending on the category of the review. The highest own motion rate, 50.7 percent, exists in the ODO protests. The next highest category is the group of individual ALJs, 14.2 percent. These rates are contrasted by the rates for the new ALJs, 7.5 percent and the random sample, 5.7 percent.

While the figures cited above are based on the cases where the Appeals Council has completed its action, there are a substantial number of cases pending where the Appeals Council's support staff has recommended that the Council take corrective action and such action has not yet been taken. Since our experience has shown that about 95 percent of these recommendations ultimately result in either reversals or remands at the AC level, it is noteworthy that the overall "recommended" own motion rate is approximately six and one-half percent higher than the actual own motion rate.

In addition to own motion rates, we also maintain information regarding the overall percentage of defective cases. A case is considered defective if the decision contains some type of deficiency—improper basis for disability conclusion, failure to follow sequential evaluation, improper questioning of an expert witness, etc.—yet reaches an ultimately correct conclusion that the claimant is disabled. Through September 1, the overall defect rate was 47.6 percent, with the various category percentages as follows: ODO protests—91.0 percent; random sample—52.7 percent; individual ALJs—49.7 percent; and now ALJs—30.5 percent. Although the majority of these decisions did not contain deficiencies so severe that an own motion action was recommended, the Social Security Regulations are not being correctly applied in many instances.

An essential requirement to ensure the success of the Bellmon review program is to provide a companion system for providing feedback on the results of the review. While the information we obtained from the review is very helpful in guiding our training and continuing education efforts, I believe there must be a more individualized process for those ALJs in the individual category. Such a system is now being implemented. The purpose of the feedback system is to advise affected ALJs of decisional weaknesses and to provide a mechanism for achieving long term improvement.

Under the first stage of the feedback system the Chief Administrative Law Judge (CALJ) will send a memorandum to the appropriate Regional Chief Administrative Law Judge (RCALJ) enclosing a brief outline of the particular problems found in the decisions of that ALJ. Also enclosed will be summaries of several cases reviewed by the Appeals Council on its own motion with supporting documentation. The RCALJ, together with Deputy Chief Administrative Law Judge Irwin Friedenberg on occasion, will meet with the ALJ involved to discuss the problems reported and review steps that can be taken to improve the accuracy of his or her decisions.

Thereafter, a further review of the ALJ's decisions will be undertaken for three months to determine if there has been improvement. If no change has occurred the CALJ may either request additional counselling through the RCALJ or authorize special training in the region or in Central Office. If there is still no measurable improvement other steps will be considered.

Initially, because of staffing limitations, feedback will be limited to those individual ALJs who are included in the 100 percent review group. As the system progresses, all ALJs remaining in the individual group will be included in this process.